# IN THE SUPREME COURT OF TEXAS

════════════

No. 10-0666

════════════

THE CITY OF ROUND ROCK, TEXAS AND
ROUND ROCK FIRE CHIEF LARRY HODGE, PETITIONERS,

v.

JAIME RODRIGUEZ AND ROUND ROCK
FIRE FIGHTERS ASSOCIATION, RESPONDENTS

════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

════════════════════════════════════════════════════

**Argued December 8, 2011**

JUSTICE GREEN delivered the opinion of the Court, in which JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE BOYD, and JUSTICE DEVINE joined.

CHIEF JUSTICE JEFFERSON filed a dissenting opinion, in which JUSTICE HECHT and JUSTICE LEHRMANN joined.

In this statutory construction case, we are asked to decide whether section 101.001 of the Texas Labor Code grants unionized public-sector employees in Texas the right to, upon request, have union representation during an internal investigatory interview when the employee reasonably believes the interview may result in disciplinary action. The court of appeals held that section 101.001 confers such a right. 317 S.W.3d 871, 875 (Tex. App.—Austin 2010, pet. granted). Although private-sector employees and federal public-sector employees both possess such a

representation right, we hold that the Texas Legislature has not granted that right to public-sector employees in Texas. *Cf.* 5 U.S.C. § 7101(b); *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 260 (1975) (interpreting 29 U.S.C. § 157). We reverse the judgment of the court of appeals and render judgment that section 101.001 of the Labor Code does not confer on public-sector employees in Texas the right to union representation at an investigatory interview that the employee reasonably believes might result in disciplinary action.

## I. Factual Background

In July 2008, Round Rock Fire Chief Larry Hodge called fire fighter Jaime Rodriguez into a meeting in Chief Hodge's office. In the room, Chief Hodge was joined by the assistant fire chief and Rodriguez's battalion chief. Chief Hodge told Rodriguez that the purpose of the meeting was to conduct an internal interview of Rodriguez regarding a personnel complaint that Chief Hodge had filed against him. Chief Hodge alleged that Rodriguez had misused his sick leave earlier that month to get a physical examination to pursue employment with the Austin Fire Department. The complaint stated, "Since this is an Internal Interview you may not be represented during our meeting; however, if a pre-disciplinary meeting is set following our meeting you would be eligible for representation at that time." The complaint also prohibited Rodriguez from discussing the complaint with anyone other than Rodriguez's attorney, including union leadership and other union members.

Before the interview began, Rodriguez asserted the right to union representation, requesting to have a representative from the Round Rock Fire Fighters Association (the Association) present during the interview. Chief Hodge denied Rodriguez's request and interviewed him without Association representation. In October 2008, Chief Hodge again met with Rodriguez to discuss

2

potential discipline for the conduct alleged in the personnel complaint. Rodriguez did not ask for a union representative at that meeting. Chief Hodge allowed Rodriguez to choose between being discharged and accepting a five-day suspension without right of appeal. A few days later, Rodriguez executed an agreement that opted for the five-day suspension.

Three months later, Rodriguez and the Association filed a declaratory judgment action, alleging that Chief Hodge and the City of Round Rock violated Rodriguez's right to union representation, and asserting that such a right is conferred by section 101.001 of the Texas Labor Code. Rodriguez and the Association also sought to enjoin Chief Hodge and the City from denying Rodriguez and other fire fighters their right to representation at future investigatory interviews. The trial court denied a motion for summary judgment filed by Chief Hodge and the City, and granted a motion for summary judgment filed by Rodriguez and the Association. In its final judgment, the trial court declared that Rodriguez was denied his right to union representation under section 101.001 of the Labor Code, and enjoined Chief Hodge and the City from further denying fire fighters the right to, upon request, be represented by the Association at investigatory interviews they reasonably believe might result in discipline. The court of appeals affirmed the decision. 317 S.W.3d at 875.

## II. The *Weingarten* Decision

The right to union representation in an investigatory interview derives from the United States Supreme Court's decision in *NLRB v. Weingarten*, 420 U.S. 251 (1975), the seminal case regarding private-sector employee representation rights. In that case, an employer challenged the National

3

Labor Relations Board's (NLRB) determination that Section 7 of the National Labor Relations Act (NLRA) granted private-sector employees the right to have a union representative present at an investigatory interview when the employee reasonably believes that the interview could result in disciplinary action. *Id.* at 260. The NLRB determined that this right inhered in Section 7's guarantee of the right of employees to engage in "concerted activities for . . . mutual aid or protection." *Id*. at 252; *see* 29 U.S.C. § 157. The Supreme Court held that the NLRB permissibly construed Section 7 to confer the representation right, noting that the NLRB's construction may not be required by the statute's text. *Weingarten*, 420 U.S. at 266–67. In doing so, the Supreme Court explained that the NLRB's decisions are "subject to limited judicial review" because of the NLRB's "special function" in interpreting Section 7 and its "special competence" in the field of labor-management relations. *Id.* at 267. Following *Weingarten*, Congress extended the representation right to federal public-sector employees. 5 U.S.C. § 7101(b). Thus, the right to union representation during investigatory interviews currently applies nationally to all private-sector employees and federal public-sector employees.

### III. Statutory Construction

Statutory construction is a question of law, and review is conducted de novo. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). Our ultimate purpose when construing a statute is to discover the Legislature's intent. *Id*. We examine the statute's text, as it provides the best indication of legislative intent. *Id.*

## A.  The Plain Language of Section 101.001 Does Not Confer
## the Representation Right Asserted by Rodriguez

Section 101.001, captioned "Right to Organize," provides: "All persons engaged in any kind of labor may associate and form trade unions and other organizations to protect themselves in their personal labor in their respective employment." TEX. LAB. CODE § 101.001; *see also Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 809 (Tex. 2010) ("[T]he title of [a statute] carries no weight, as a heading does not limit or expand the meaning of a statute." (internal quotation marks omitted)). While the statute is broad, we do not read it as conferring, by its plain language, the specific right to have a union representative present at an investigatory interview that an employee reasonably believes might result in disciplinary action.  In fact, on its face, the statute confers only one explicit right: the right to organize into a trade union or other organization.  By its plain terms, the statute makes it lawful for employees to form labor unions or other organizations, and specifically, those organizations created to protect them in their employment.  It says nothing about any rights that may attach once such unions are formed.

Indeed, this Court has previously recognized this construction of section 101.001 when discussing the joint purpose of a former codification of section 101.001 and section 101.002 of the Labor Code, which addresses the rights of individuals to influence others in employment matters. *See Best Motor Lines v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local No. 745*, 237 S.W.2d 589, 598 (Tex. 1951).  We stated that these statutes are "the very statutes which give the unions life" and that, "[u]nder these statutes, labor unions are permitted to organize and work for the betterment of their members." *Id.*  We clearly delineated the specific roles of each

statute: Section 101.001 confers the right to organize into a union, and section 101.002 then provides substance to that right by allowing employees to influence other employees to enter, refuse, or quit employment. *Id.*; *see also* TEX. LAB. CODE §§ 101.001, .002; *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 636 n.18 (1975) (noting that a former codification of sections 101.001 and 101.002 "declare that it is lawful for workers to associate in unions and to induce other persons to accept or reject employment"); *United Mine Workers of Am. v. Coronado Coal Co.*, 259 U.S. 344, 386 n.1 (1922) (describing a former codification of section 101.001 as being enacted for the purpose of "[l]egalization of labor unions and labor combinations"); *Webb v. Cooks', Waiters' & Waitresses' Union, No. 748*, 205 S.W. 465, 469 (Tex. Civ. App.—Fort Worth 1918, writ ref'd) (stating that a former codification of section 101.001 "provid[es] that it shall be lawful for persons engaged in any kind of labor to associate themselves together and form unions" and that a former codification of section 101.002 then makes a "declaration relating to the rights and privileges of such associations"). Our sister court, the Court of Criminal Appeals, has also recognized the limited scope of a former codification of section 101.001, stating that it "grants the right to a person to organize or become a member of a labor union." *Ex parte Waltrip*, 207 S.W.2d 872, 874 (Tex. Crim. App. 1948).

This reading of section 101.001 comports with other labor-related provisions in the Texas statutes, which are premised on section 101.001's right to form unions. While section 101.001 protects the right of employees to organize into labor unions, section 101.052 of the Labor Code protects the "right to work." *See* TEX. LAB. CODE § 101.052; *see also Lunsford v. City of Bryan*, 297 S.W.2d 115, 117 (Tex. 1957) (describing a former codification of section 101.052 as our "right-to-

6

work" statute). This Court has recognized that the "intent [of the right-to-work statute] seems obvious to protect *employees in the exercise of the right* of free choice of joining or not joining a union." *Lunsford*, 297 S.W.2d at 117 (emphasis added); *see also McNatt v. Lawther*, 223 S.W. 504, 505 (Tex. Civ. App.—Amarillo 1920, no writ) (holding that, prior to enactment of the right-to-work statute, a previous codification of section 101.001 protected only the right of employees to organize, and thus it allowed employers to fire employees for joining a union).

Similarly, our construction of section 101.001—as conferring the right to organize into unions— is in accord with Chapter 617 of the Texas Government Code, which defines specific rights of Texas public-sector labor unions. *See* TEX. GOV'T CODE §§ 617.001–.003 (expressly disarming public-sector unions of rights usually enjoyed in the private sector, such as striking and collective bargaining); *id.* § 617.005 (granting public-sector unionized employees the limited right "to present grievances concerning their wages, hours of employment, or conditions of work either individually or through a representative that does not claim the right to strike"); *see also* Tex. Att'y Gen. Op. No. H-422 (1974) (determining that implicit in section 617.005 "is the notion that public officials should meet with public employees or their representatives at reasonable times and places to hear their grievances concerning wages, hours of work, and conditions of work"). Chapter 617, while conferring the right to present grievances, does not confer the right to union representation during investigatory interviews.

### B. Section 7 of the NLRA Differs Significantly from Section 101.001

Although we look to federal statutes and case law when a Texas statute and federal statute are "animated in their common history, language, and purpose," *see Barr v. City of Sinton*, 295

7

S.W.3d 287, 296 & n.42 (Tex. 2009), key differences between the NLRA and the state statutes here compel a different result from that reached by the United States Supreme Court in *Weingarten*. *See Weingarten*, 420 U.S. at 260.

> Section 7 of the NLRA states, in relevant part:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

29 U.S.C. § 157. In contrast, section 101.001 provides:

> All persons engaged in any kind of labor may associate and form trade unions and other organizations to protect themselves in their personal labor in their respective employment.

TEX. LAB. CODE § 101.001. Although Rodriguez and the dissent argue that the language is "substantially similar," ___ S.W.3d at ___, we read the statutes as substantially dissimilar.

Section 7 confers four rights that union members can invoke for their protection: (1) "self-organization"; (2) "form, join, or assist labor organizations"; (3) "bargain collectively through representatives of their own choosing"; and (4) "engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The *Weingarten* right recognized by the Supreme Court is rooted in that fourth right—"the individual right of the employee, protected by [Section] 7 of the Act, 'to engage in . . . concerted activities for . . . mutual aid or protection.'" *Weingarten*, 420 U.S. at 252 (omissions in original). Because Section 7 guarantees private-sector employees the specific right to collective bargaining and the more general right to engage in other concerted activity toward collective bargaining or some other sort of aid or

protection—rights that attach once unions are formed—the Supreme Court concluded that the language of Section 7 could include the *Weingarten* right. *See id* at 260–61. While section 101.001 mirrors Section 7 in conferring the first right—a right to organize—and part of the second—a right to form unions and other organizations—granted to private-sector employees, nothing in section 101.001 allows us to reach the same conclusion. *See* TEX. LAB. CODE § 101.001. Just as the Fifth Circuit declined to find a representation right for railway employees because the Railway Labor Act lacks the "concerted activities" language found in the NLRA, *see Johnson v. Express One Int'l Inc.*, 944 F.2d 247, 251 (5th Cir. 1991), we cannot find a representation right in section 101.001 without similar "concerted activities" language. *See id.* (warning against applying NLRA case law to statutes with language that "differs substantially" from the NLRA). *Cf. N.Y.C. Transit Auth. v. N.Y. State Pub. Emp't Relations Bd.*, 864 N.E.2d 56, 56 (N.Y. 2007) (holding that a state statute that differed materially from the text of NLRA Section 7 and lacked "concerted activities for . . . mutual aid or protection" language did not give a representation right to public-sector employees).

The dissent suggests that the mere inclusion of the word "protect" in the statute indicates the Legislature's intent to grant unionized public-sector employees specific rights to enable them to seek protection in their employment, including the right to union representation during investigatory interviews.[1] ___ S.W.3d at ___. But, as explained above, there is nothing in the statute to indicate

___

[1] To reach this conclusion, the dissent's construction impliedly requires "associate" to mean "to join together for the purpose of *representing* each other." In other words, the dissent's construction of section 101.001 would read that employees may "join together for the purpose of *representing* each other . . . to protect themselves." However, "associate" means "to come together as partners, fellow workers, colleagues, friends, companions, or allies" and does not include a right of representation. *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). It is unclear what limits, if any, the dissent believes the statute imposes on that right to representation, or whether the dissent would somehow judicially impose limits on the statutory language to recognize only the narrow representation right at issue in this case. The plain language of section 101.001 supports our holding in this case, negating the necessity to impose

9

such an intent.  We read "protect" as describing the purpose around which individuals would organize and form unions, pursuant to the right conferred under section 101.001.  The Legislature grants and denies rights to unionized public-sector employees by specific enactment.  *See, e.g.*, TEX. GOV'T CODE § 617.002(a) (denying public-sector employees the right to bargain collectively); *id.* § 617.003 (denying public-sector employees the right to strike); *id.* § 617.005 (granting public-sector employees the right to present their grievances concerning wages, hours, or conditions of work through a union representative).  At most, the inclusion of "protect" serves as a limitation on the type of union or organization—those formed to protect employees in their employment—whose members are subject to those specific enactments that grant rights, such as the right to present work-related grievances, and deny rights, such as collective bargaining and the right to strike.  This reading does not deprive section 101.001 of meaning; rather, when read in connection with the grants and denials of specific rights, it gives section 101.001 precisely the meaning the plain language indicates the Legislature intended:  Texas public employees have the right to band together and form labor unions.

## C.  The Supreme Court's Analysis in *Weingarten* Does Not Apply

*Weingarten* provides little guidance for important reasons.  First, there is no question that Section 7 of the NLRA and the *Weingarten* decision apply only to private-sector employees.  *See* 29 U.S.C. § 152(2) (excepting from the definition of "employer" "the United States . . . or any State or political subdivision thereof").  It was not until after the *Weingarten* decision that Congress specifically extended the representation right to federal public-sector employees.  *See* 5 U.S.C.

---

any such limitations under section 101.001—a task that, even if it were required, is better suited for the Legislature.

§§ 7101(b), 7114(a)(2)(B). In the thirty-eight years since *Weingarten* was decided, the Texas Legislature has declined to enact similar legislation.

Second, Section 7 does not expressly confer the *Weingarten* right, and the Supreme Court recognized that. *See Weingarten*, 420 U.S. at 266–67. In *Weingarten*, the Court merely determined that the NLRB had permissibly construed Section 7 to find the *Weingarten* right rooted in the "concerted activities" portion of that statute, although the language of Section 7 may not actually grant the right. *See id.* (stating that even though the NLRB's construction "may not be required by [Section 7, it] is at least permissible under it"). The Court afforded the NLRB's construction considerable deference because, with its "special competence," the NLRB is entrusted with "responsibility to adapt the [NLRA] to changing patterns of life," and its construction of the NLRA is therefore "subject to limited judicial review." *See id.* at 264–68; *see also Pattern Makers' League of N. Am., AFL-CIO v. NLRB*, 473 U.S. 95, 100 (1985) ("Because of the [NLRB]'s 'special competence' in the field of labor relations, its interpretation of the [NLRA] is accorded substantial deference." (citing *Weingarten*, 420 U.S. at 266)); *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 500 (1978) (noting, when construing a different statute, that "[e]ven if the legislative history arguably pointed toward a contrary view, the [NLRB]'s construction of the statute's policies would be entitled to considerable deference" (citing *Weingarten*, 420 U.S. at 251)). In Texas, we have no NLRB equivalent. Instead, labor policy and regulation is determined exclusively by the Texas Legislature and the language of its legislative enactments. And, unlike the United States Congress, the Texas Legislature has not enacted legislation to confer the right to union representation on Texas public-sector employees during investigatory interviews.

11

Third, as explained above, the *Weingarten* decision was based on language in Section 7 that is absent from section 101.001. Without anything resembling Section 7's "concerted activities" language, section 101.001 cannot confer on Texas public-sector employees a right to have union representation during investigatory interviews they reasonably believe may result in disciplinary action.

### D. Related State and Federal Statutory Enactments Support This Construction of Section 101.001

When a statute is clear and unambiguous, we do not resort to extrinsic aides such as legislative history to interpret the statute. *Entergy*, 282 S.W.3d at 442; *see Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex. 2011) ("[T]he Legislature expresses its intent by the words it enacts and declares to be the law."). In construing a statute, however, we presume that the Legislature acted with knowledge of the background law and with reference to it. *See Tex. Parks & Wildlife Dep't v. Dearing*, 240 S.W.3d 330, 351 (Tex. 2007).

The Legislature enacted the first codification of section 101.001 in 1899, long before Congress enacted the NLRA or the Supreme Court decided the *Weingarten* case. *See* Act of May 27, 1899, 26th Leg., ch. CLIII, 1899 Tex. Gen. Laws 262, 262. The original 1899 provision stated:

> [I]t shall be lawful for any and all persons engaged in any kind of work or labor, manual or mental, or both, to associate themselves together and form trade unions and other organizations for the purpose of protecting themselves in their personal work, personal labor, and personal service, in their respective pursuits and employments.

*Id.* At the time this provision was enacted, unions were attempting to clarify their position under recent state and federal antitrust legislation. *See Allen Bradley Co. v. Local Union No. 3, Int'l Bhd.*

12

*of Elec. Workers*, 325 U.S. 797, 803 (1945) (discussing this "well known history of the era between 1890 and 1914"). In 1890, Congress passed the landmark Sherman Antitrust Act, which included language broad enough to consider labor unions to be trusts. Sherman Act, ch. 647, 26 Stat. 209, 209–10 (1890) (codified as amended at 15 U.S.C. §§ 1–7); *see also Allen Bradley Co.*, 325 U.S. at 801 ("The Sherman Act as originally passed contained no language expressly exempting any labor union activities. Sharp controversy soon arose as to whether the Act applied to unions."); WILLIAM HOWARD TAFT, THE ANTI-TRUST ACT AND THE SUPREME COURT 2 (1914) ("Whether Congress intended it or not, it used language [in the Sherman Antitrust Act] that necessarily forbade the combination of laborers to restrain and obstruct interstate trade."). By 1889, Texas had enacted similar comprehensive antitrust legislation, and the Legislature amended Texas antitrust laws in 1899. *See* Act of May 25, 1899, 26th Leg., ch. CXLVI, 1899 Tex. Gen. Laws 246, 246; Act of March 30, 1889, 21st Leg., ch. 117, 1889 Tex. Gen. Laws 141, 141–42. Two days after passing those amendments, the Legislature enacted the 1899 right-to-organize statute, which included language clarifying labor's role under Texas's antitrust laws. *See* Act of May 27, 1899, 26th Leg., ch. CLIII, 1899 Tex. Gen. Laws 262, 262 ("[N]othing herein contained shall be construed to repeal, affect or diminish the force and effect of any statute now existing on the subject of trusts, conspiracies against trade, pools and monopolies."); *see Connell Constr. Co.*, 421 U.S. at 636 n.18 (citing the 1899 right-to-organize statute as "a good example" of state antitrust laws that tend to make labor activities more likely to violate state antitrust laws).

Courts of appeals have acknowledged this historical context when discussing the former codification of section 101.001. For example, the Seventh Court of Appeals surmised:

13

It was probably the purpose of this legislation to make it clear that the early English decisions, which held labor unions under certain circumstances to be unlawful, and our own laws against trusts and combinations in restraint of trade, did not apply to labor unions. The act merely announced that there was no prohibition of law against such unions.

*McNatt*, 223 S.W. at 505; *see Webb*, 205 S.W. at 469 (harmonizing former codifications of sections 101.001 and 101.002 with Texas antitrust statutes).

As the Texas Legislature had done with the 1899 right-to-organize statute, the United States Congress enacted legislation in 1914 to exempt labor unions from antitrust laws. *See Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 464 (1960) (explaining that "Congress in 1914 inserted § 6 in the Clayton Act [to exempt] agricultural organizations, along with labor unions, from the antitrust laws."). The Clayton Act provides:

Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor . . . organizations, instituted *for the purposes of mutual help . . .* or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objectives thereof; nor shall such organizations, or the members thereof, be held or construed to be *illegal combinations* or conspiracies in *restraint of trade*, under the anti-trust laws.

15 U.S.C. § 17 (emphasis added). This language from the Clayton Act uses terminology similar to that in Texas's 1899 right-to-organize statute, the predecessor to today's section 101.001. *See* Act of May 27, 1899, 26th Leg., ch. CLIII, 1899 Tex. Gen. Laws 262, 262 ("[T]he foregoing sections shall not be held to apply to any *combination or combinations . . .* for any other purpose in *restraint of trade . . . .*" (emphasis added)). In this historical context, it is clear that the 1899 right-to-organize statute aligns more closely with the Clayton Act of 1914, which partially exempted labor unions from violating federal antitrust laws, than with Section 7 of the NLRA, which was not enacted until

14

much later.  The Supreme Court has recognized as much, listing a former codification of section 101.001 alongside the Clayton Act as legislation for the "[l]egalization of labor unions and labor combinations."  *See United Mine Workers of Am.*, 259 U.S. at 386 n.1; *see also Connell Constr. Co.* 421 U.S. at 636 n.18 (noting that a former codification of section 101.001 "declare[s] that it is lawful for workers to associate in unions").

This legislative context supports a reading of the statute in line with the plain meaning of the statute—section 101.001 allows individuals to lawfully organize and form labor unions without violating antitrust laws.

### E.  If Representation Rights Are to Be Conferred on Texas Public-Sector Employees, The Legislature Must Make That Policy Determination

We recognize, as the dissent does, that there are good reasons for Texas public-sector employees to have the same access to union representation in investigatory interviews as private-sector employees and federal public-sector employees. *See* ___ S.W.3d at ___; *see*, *e.g.*, *Weingarten*, 420 U.S. at 262–64.  In Texas, however, the Legislature must make this policy determination.  *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 873 (Tex. 2000) (explaining that, in Texas, legislative power includes the power to set public policy as well as "many functions that have administrative aspects, including the power to provide the details of the law, to promulgate rules and regulations to apply the law, and to ascertain conditions upon which existing laws may operate"). Our role in statutory construction is merely to give effect to the Legislature's intent by examining the plain meaning of the statute.  *See Kimbrell*, 356 S.W.3d at 414 ("It is the Legislature's prerogative to enact statutes; it is the judiciary's responsibility to interpret those statutes according

15

to the language the Legislature used . . . ."). Here, we must give effect to the statute's silence on this issue and the Legislature's decision not to confer representation rights akin to *Weingarten* rights on Texas public-sector employees. *See Seay v. Hall*, 677 S.W.2d 19, 25 (Tex. 1984) ("While this court may properly write in areas traditionally reserved to the judicial branch of government, it would be a usurpation of our powers to add language to a law where the [L]egislature has refrained."); *Simmons v. Arnim*, 220 S.W. 66, 70 (Tex. 1920) ("[Courts] are not the law-making body. They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law.").

Although it seems an anomaly for Texas public-sector employees to have to face investigatory interviews alone, we note that the Legislature may have good reasons for treating public-sector employees in Texas differently from private-sector employees. *See, e.g.*, *Cong. of Indust. Org. v. City of Dallas*, 198 S.W.2d 143, 144 (Tex. Civ. App.—Dallas 1946, writ ref'd n.r.e.) ("[T]he status of governmental employees, National, State and Municipal, is radically different from that of employees in private business or industry."); *see also Headquarters Nat'l Aeronautics & Space Admin.*, 50 F.L.R.A. 601, 608 n.5 (1995) (noting "Congress'[s] recognition that the [*Weingarten*] right to representation might evolve differently in the private and Federal sectors"). For example, the Legislature may have decided not to extend such a representation right to Texas public-sector employees because unions in Texas lack authority to engage in collective bargaining, unlike the union in *Weingarten*. *See* Tex. Gov't Code § 617.002.

## IV. Conclusion

We hold that section 101.001 of the Labor Code does not confer on public-sector employees in Texas the right to union representation when an employee reasonably believes that an investigatory interview with the employer may result in disciplinary action. Accordingly, the judgment of the court of appeals is reversed, and we render judgment for declaratory relief consistent with this opinion. *See* TEX. R. APP. P. 60.2(c).

_____
Paul W. Green
Justice

OPINION DELIVERED: April 5, 2013