

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00069-CV

_____

IN THE INTEREST OF Y.K., A CHILD

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-744055-23

Before Birdwell, Bassel, and Walker, JJ.
Opinion by Justice Walker

## OPINION

## I. INTRODUCTION

Appellants L.K. (Father) and V.M. (Mother) appeal the trial court's order terminating the parent–child relationship with their child, Y.K.[1]

Both parents present the same sole issue on appeal[2]—that the trial court improperly granted termination because its order does not comply with Subsections 161.001(f) and (g) of the Texas Family Code.[3] These subsections mandate that the trial court include, in a separate section of its termination order, written findings describing with specificity the reasonable efforts the Texas Department of Family and Protective Services (the Department) made to return the child to the child's parents and home. Tex. Fam. Code Ann. § 161.001(f)(1), (g).

Father and Mother do not argue that the trial court entirely failed to make findings, nor do they contend that the findings lack evidentiary support. Rather, as a matter of first impression, they assert that the trial court's findings amount to—as Father puts it—no more than a "generic talismanic recitation of [S]ection

---

[1]To protect the child's identity, we refer to the child by her initials and refer to others by their relationship to the child. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]Mother initially filed an *Anders* brief, but after Father filed his brief, she requested permission to file an amended brief, which we granted. Mother's amended brief raised the same issue brought by Father.

[3]Father and Mother do not challenge the trial court's findings for the predicate-conduct grounds or the best-interest finding. *See id.* § 161.001(b)(1), (2).

161.001(f)(1)." On that basis, they allege that the findings are inadequate and nonspecific, and thus, the trial court lacked jurisdiction to terminate their parental rights. Because we hold that trial court's findings are sufficiently specific to satisfy Subsections (f) and (g), we will affirm. *See id.* § 161.001(f)(1), (g).

## II. FACTUAL AND PROCEDURAL BACKGROUND

On November 27, 2023, the Department received an intake alleging that Mother and Y.K.—at birth—tested positive for opiates, methadone, cocaine, cannabinoids, and amphetamines.[4] The Department began an investigation, and Mother admitted that she used fentanyl, methamphetamines, and tobacco five hours prior to Y.K.'s delivery. Because of the intrauterine drug exposure, Y.K. suffered from withdrawal symptoms, including weight loss, generalized hypertonia, disturbed tremors, and irritability. She had to be administered morphine over the course of several days to combat the withdrawal symptoms.

Y.K.'s positive results for controlled substances and Mother's admission of using controlled substances while pregnant concerned the Department for Y.K.'s physical health and safety. Moreover, Y.K. required continued care for the withdrawal symptoms and follow-up appointments with her pediatrician, but Mother was unable to reasonably provide this advanced care due to her substance abuse.

---

[4]Y.K. was born on November 27, 2023. Her urine was positive for fentanyl and amphetamines, and her cord blood was positive for fentanyl, methadone, methadone metabolite, amphetamine, benzoylecgonine, cocaine, and methamphetamine.

3

Additional concerns included Father's incarceration for manufacturing controlled substances, the continuing risk of exposure to controlled substances because of Mother's substance abuse, and Father's and Mother's criminal histories and prior experiences with the Department.[5]

In an alternative to removal, the Department evaluated family and friends for possible placement, including suggestions provided by Mother. The maternal grandparents were unable to care for Y.K. because they were already the current placements for her half-brother. The paternal grandmother (Grandma) was ruled out as a potential placement because of her previous history with the Department,[6] and the paternal grandfather stated that he was willing but unable to care for Y.K. because he was leaving the country soon and would have to leave Y.K. with Grandma. Family friends were also evaluated but ruled out due to criminal history. Because the Department's evaluation revealed no suitable placement with family or friends, Y.K. was removed and placed with a foster family.

---

[5]The Department had initiated two previous cases with Mother: an investigation in 2016 after the death of one of her children and the removal of her now-eldest child in 2021. Father and Mother also had prior criminal histories involving the manufacture, delivery, or possession of controlled substances.

[6]Grandma's history with the Department involved Father's two other daughters that were placed in, but not removed from, her care.

To address its concerns of Father's and Mother's extensive substance abuse and criminal histories, the Department developed service plans for each parent.[7]

Mother's service plan included a drug and alcohol assessment, random drug testing, a psychological evaluation, individual counseling, FOCUS for Mothers, and overall stability, transportation, employment, and housing. Mother began FOCUS for Mothers by attending one class but was unsuccessfully discharged. Mother refused monthly drug testing because she did not want a paper trail of her drug use, and the Department viewed the missed tests as presumed positives. Mother did not provide proof of employment or stability during the pendency of the case, and a Department caseworker suspected that Mother may have been homeless. Mother did not complete any of her services during the case.

Mother was offered weekly two-hour visits with Y.K., and she attended fourteen of the twenty-one visits. There were inconsistencies in the visits due to Mother's incarceration and her lack of communication with caseworkers. Mother also admitted to using controlled substances throughout her adulthood and during the pendency of the case, particularly (1) five hours before Y.K.'s birth, (2) three days before the original trial date, and (3) a month before the final trial.

---

[7]The Department provided each parent with a copy of their service plan, explained the services and respective requirements, and both parents agreed to work their service plan.

As for Father, his service plan was conditioned upon his release from incarceration and included a drug and alcohol assessment, random drug testing, a psychological evaluation, individual counseling, FOCUS for Fathers, and overall stability, transportation, employment, and housing. And despite a discussion about an early release, Father was never released from incarceration, and as a result, he did not complete his service plan. Because of his incarceration, the Department could not schedule visits, and Father never had contact with Y.K.

A caseworker with the Department explained to the trial court the reasonable efforts the Department had taken during the case: making appropriate referrals, paying for the services, establishing visitation for Mother, and providing Mother with either cab vouchers or other transportation services. The caseworker also detailed the Department's continuing efforts in evaluating Mother's suggested placements, including various family members and friends. However, the Department could not approve any of the suggestions due to extensive criminal histories or insufficient information regarding their ability to care for Y.K.[8]

The caseworker further described how, despite the initial denial by the Department, a home study was conducted on Grandma. Grandma provided inconsistent answers to the Department's questions, but the home study was

[8]At one point in the case, Mother suggested that Y.K. be placed with a stranger. Such a suggestion concerned caseworkers, as Mother desired—or was at least willing—to place Y.K. with someone whom she had no knowledge of their background, history, stability, or quality of environment.

preliminarily approved. However, irrespective of the Department's approval, the trial court refused to place Y.K. with Grandma. The Department grew concerned about Grandma's protective capabilities and her dishonesty. The caseworker explained that, as far as Grandma's underlying case with the Department, she did not appear to have a support system that she could rely upon to supervise the children in her care when she had to run errands.

By the time of trial, the Department had been unable to locate a safe and stable placement for Y.K. outside of her foster-care placement. At trial, a caseworker testified that Y.K.'s current foster family was adoption motivated, active in addressing her withdrawal symptoms, and facilitated interaction with her biological family. The caseworker further testified that she believed the foster family was able to meet Y.K.'s physical, emotional, and financial needs and that the Department's plan was to support the foster family's adoption of Y.K. In contrast, the caseworker explained that she did not believe that Y.K. should be returned to either Father or Mother because of how Y.K. entered care, the reasons that her siblings had previously entered care, and because neither parent demonstrated any ability to provide a safe and stable environment for her. Other than one parenting class, Mother did not engage in services. Likewise, because of Father's prior decision making, he was not able to provide Y.K. with stability or a safe home. Mother's continual abuse of controlled substances and Father's criminal history presented an unsafe dynamic for Y.K. The

7

caseworker requested that the trial court terminate Father's and Mother's parental rights.

Grandma testified that she works two days a week and that she cares for Father's two other daughters. Regarding her prior case with the Department, Grandma agreed that a safety plan had been put in place, but she denied violating it. Grandma claimed that she had completed the services offered in the prior safety plan, but as for this case, the Department did not afford her the opportunity to address its concerns because she was never offered any services. Grandma testified that she was willing to care for Y.K. and that she would follow any requirements set by the trial court. She described the foster family as very nice and that they had kept in regular contact with her, visited twice a month, and invited her family to Y.K.'s recent birthday party.

Y.K.'s foster mother also testified and explained that when Y.K. first came home from the hospital, she was still detoxing and shaky. During the first two months, there were times when Y.K. was inconsolable and had difficulty sleeping. She further explained that Y.K. requires more attention than a normal, healthy baby and that Y.K. still has some eye twitches. The foster mother described Y.K. as very joyful, loved by many, and very attached to the foster family. The foster mother testified that she and her husband are prepared for any ongoing concerns with Y.K., that they have a close network of support, and that their adoption agency offers post-adoption services if needed.

Finally, Mother's younger sister testified that Mother had begun using controlled substances when she was sixteen years old, that she had been to jail for controlled substances, and that all of her children had been born with controlled substances in their system. Mother's sister explained that she believes Mother still uses controlled substances and that it is in Y.K.'s best interest to terminate Father' and Mother's parental rights. She further explained that she is very close to Y.K.'s foster parents, that she regularly sees Y.K., and that she believes the foster parents will keep Y.K.'s biological family involved in her life.

After hearing all of the testimony, the trial court signed an order of termination, finding that termination of the parent–child relationship between Father and Y.K. was in her best interest and warranted under Family Code Section 161.001(b)(1)(N), (O), and (Q) and that termination of the parent–child relationship between Mother and Y.K. was in her best interest and warranted under Family Code Section 161.001(b)(1)(D), (E), (O), and (P). This appeal followed.

## III. DISCUSSION

### A. SPECIFICITY OF SUBSECTIONS 161.001(F) AND (G)

Contending that the trial court's findings that the Department made reasonable efforts to return Y.K. are generic and insufficiently specific, Father and Mother assert that the termination order does not comply with Subsections 161.001(f) and (g). *See* Tex. Fam. Code Ann. § 161.001(f)(1), (g). We disagree.

### 1. Standard of Review and Applicable Law

In 2023, the Texas Legislature amended Section 161.001 of the Family Code to require a trial court to make certain written findings a condition of ordering the termination of parental rights. *Id.* As amended, Subsections (f) and (g) provide that:

> (f) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:
>
> > (1) the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent; or
> >
> > (2) reasonable efforts to return the child to the parent, including the requirement for the department to provide a family service plan to the parent, have been waived under Section 262.2015.
>
> (g) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services in which the department made reasonable efforts to return the child to the child's home but a continuing danger in the home prevented the child's return, the court shall include in a separate section of its order written findings describing with specificity the reasonable efforts the department made to return the child to the child's home.

*Id.*

These provisions are only implicated when the Department files a suit for termination and the trial court grants termination of a party's parental rights under Section 161.001(b)(1). *See id.*

10

"Statutory construction is a question of law, and review is conducted de novo." *City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 133 (Tex. 2013). "Our ultimate purpose when construing a statute is to discover the Legislature's intent," and the statute's text is the best indication thereof. *Id.* We must not interpret the statute in a manner that renders any part or provision meaningless or superfluous. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008). "In ascertaining a term's meaning, courts look primarily to how that term is used throughout the statute as a whole." *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002).

Statutory terms should be interpreted consistently in every part of an act. *Id.* Thus, "courts should not give an undefined statutory term a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction if standing alone." *Id.*; *see also State v. Haltom Med. Invs., L.L.C.*, 153 S.W.3d 664, 669 (Tex. App.—Fort Worth 2004, no pet.) ("Unless there is language clearly indicating a contrary intent, words or phrases used in different parts of a statute are presumed to have the same meaning throughout, and where the meaning in one instance is clear, this meaning will be attached in all other instances.").

## 2. Findings for Subsections (f) and (g) are Sufficiently Specific

Father maintains that the legislative intent for Subsections (f) and (g) is to provide appellate courts "with meaningful findings that could be used to review the

11

sufficiency of the evidence supporting these findings."[9] He further contends that the trial court's findings are "generic" and "insufficiently specific." Similarly, Mother argues that the trial court's termination order "contains no specific language" that complies with Subsections (f) and (g) and that the statute "require[s] meaningful findings" describing the Department's reasonable efforts to return the child. Father and Mother contend that the trial court's failure to make more specific findings regarding the Department's reasonable efforts to return Y.K. to them deprives the trial court of jurisdiction to terminate their parental rights.[10]

Here, the suit for termination of the parent–child relationship was filed by the Department and the trial court granted the termination of Father's and Mother's parental rights under Subsection 161.001(b)(1).[11] Therefore, the trial court's termination order had to comply with Subsections (f) and (g). *See* Tex. Fam. Code Ann. § 161.001(f)(1), (g).

---

[9]Father and Mother cite to *Interest of M.N.M.*, but the issue on appeal there was the sufficiency of the evidence supporting the trial court's (f) and (g) findings—not that the findings themselves were inadequately specific. 708 S.W.3d 321 (Tex. App.—Eastland 2025, pet. denied).

[10]Neither parent complains of the specificity—of lack thereof—regarding the trial court's finding of continuing danger in the home. Instead, Father and Mother confine their challenge to the lack of specificity in the trial court's finding that the Department made reasonable efforts to return Y.K.

[11]Under Family Code Subsection 161.001(b)(1), the trial court found that termination of Father's parental rights was warranted under Subsections (N), (O), and (Q) and that termination of Mother's parental rights was warranted under Subsections (D), (E), (O), and (P). *See* Tex. Fam. Code Ann. § 161.001(b)(1).

In a separate section of its termination order, the trial court found by clear and convincing evidence that the Department had made reasonable efforts to return Y.K. to Father and Mother. However, despite those reasonable efforts to return Y.K. to her parents, a continuing danger remained in the home that prevented her return.

The trial court specifically found that those reasonable efforts included the following:

- The Department created a family service plan that is narrowly tailored to address any specific issues identified.

- The Department made a referral for services, provided services, or paid for services.

The trial court later signed supplemental findings.[12] In those supplemental findings, the trial court found that the Department had made reasonable efforts to return Y.K. to Father and Mother before commencement of a trial on the merits, and despite those reasonable efforts, a continuing danger remained in the home that prevented the return of Y.K. to her parents. The trial court further specifically found that the Department had made the following reasonable efforts to return Y.K. to Father and Mother:

- The Court finds that . . . [Mother] was created a family service plan that was narrowly tailored to address any specific issues identified.

- The Court finds that . . . [Father] was created a family service plan that was narrowly tailored to address any specific issues identified.

[12]We abated the case so the trial court could make further findings.

13

- The Court finds that the Department made referrals for services, provided services and paid for services to address the reasons the child came into care.

- The Court finds that the Department discussed with [Mother] about safe placement options, however all provided relatives are not appropriate for safe placement of [Y.K.].

- The Court finds that the Department provided an opportunity to visit with her children weekly, but [Mother] missed multiple visits.

- The Court finds that the Department was working with [Father] towards reunification, but [Father] engaged in criminal conduct that has prevented him from being available to parent [Y.K.].

- The Court finds that the Department additionally made available cab vouchers, bus passes, and virtual services upon request where available.

In light of the relatively recent enactment of these subsections, we have found no authority that defines, clarifies, or discusses the degree of specificity required for the trial court's findings in Subsections (f) and (g). We note that the plain language of the subsections does not prescribe the minimum number of findings the trial court must make, nor the degree of specificity required. Tex. Fam. Code Ann. § 161.001(f)–(g). We will separately discuss each subsection.

### a. Subsection (f)

Subsection (f) requires that, before ordering the termination of parental rights, a trial court must find by clear and convincing evidence and describe in writing with specificity in a separate section of the order that the Department "made reasonable

14

efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent." *Id.* § 161.001(f)(1).

Here, in a separate section of the termination order, the trial court described that it "[found] by clear and convincing evidence that the Department made reasonable efforts to return the child to the parent. However, despite those reasonable efforts to return the child home to the parent, a continuing danger remains in the home that prevents return."

Thus, the trial court's order specifically stated that it found by clear and convincing evidence that the Department made reasonable efforts to return Y.K. to her parents and that a continuing danger remains in the home that prevents her return. Because the trial court made this specific finding, we conclude that the trial court's termination order complies with Subsection (f). *See id.* § 161.001(f)(1).

### b. Subsection (g)

Similarly, Subsection (g) requires the trial court to include, in a separate section of its order, written findings describing with specificity the reasonable efforts the Department made to return the child to the child's home. *Id.* § 161.001(g). In what appears to be a first-of-its kind challenge, Father and Mother challenge the specificity of the trial court's findings and maintain that the trial court's order does not comport with the requirements of Subsection (g) because the findings are not sufficiently specific.

15

In a separate section of its order, the trial court described that it "specifically [found] that those reasonable efforts include . . . [t]he Department [creating] a family service plan that is narrowly tailored to address any specific issues identified" and "[making] a referral for services, provided services, and or paid for services."

The trial court then made further specific findings that the Department had (1) created a family service plan for Father and Mother that was narrowly tailored to address any specific issues identified;[13] (2) made referrals for services, provided services, and paid for services to address the reasons Y.K. came into care; (3) discussed safe placement options with Mother, however, all provided relatives were not appropriate for safe placement of Y.K.; (4) provided Mother an opportunity to visit with her children weekly, but she missed multiple visits; (4) worked with Father towards reunification, but he engaged in criminal conduct that prevented him from being available to parent Y.K.; and (5) made available cab vouchers, bus passes, and virtual services upon request where available.

Father contends that Subsection (g) is intended to afford appellate courts "with meaningful findings" that can be used to review the sufficiency of the evidence. Likewise, Mother maintains that the purpose of this subsection is to afford us with

---

[13]The Department's implementation of a family service plan is generally considered a reasonable effort to return the child to the parent. *See, e.g., A.D. v. Tex. Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 714 (Tex. App.—Austin 2023, no pet.); *In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

"meaningful findings" to aid in our review of the sufficiency of the evidence.[14]  We

conclude the trial court's findings are sufficiently specific to permit us to do so.

Contrary to Father's contention that these findings are generalities, they are

based on testimony and directly related to the Department's reasonable efforts.  The

caseworker testified about each parent's service plan.  Mother's service plan included a

drug and alcohol assessment, random drug testing, a psychological evaluation,

individual counseling, FOCUS for Mothers, and overall stability, transportation,

employment, and housing.  As for Father, his service plan was conditioned upon his

release from incarceration and included a drug and alcohol assessment, random drug

testing, a psychological evaluation, individual counseling, FOCUS for Fathers, and

overall stability, transportation, employment, and housing.  The caseworker also

explained that the Department made appropriate referrals, paid for the services,

established visitation for Mother, and provided Mother with either cab vouchers or

other transportation services.

Thus, the trial court's findings that the Department created a family service

plan and made services available to Father and Mother are sufficient—under the facts

---

[14]Mother asserts that "[t]hese statutes require meaningful findings," but the term "meaningful findings" does not appear in Subsection (g), and she does not clarify what additional findings she believes are required.  Subsection (g) undeniably mandates that the trial court must make specific findings regarding the Department's efforts to reunify the family.  However, it appears that Father and Mother are advocating for a level of detail or particularity that exceeds the statutory requirements.  While Subsection (g) demands specificity, it does not require the heightened standard that they seek to impose.

of this case—to inform us of the reasonable efforts the Department had taken to return Y.K. to her parents, and we conclude that the trial court's findings comport with Subsection (g)'s specificity requirements. We hold that the reasonable efforts listed by the trial court are sufficiently specific, as they clearly identified and described the efforts the Department made to return Y.K. to her parents. Accordingly, we overrule Father's and Mother's sole issue.

## IV. CONCLUSION

Having overruled Father and Mother's sole issue, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered: July 17, 2025