**Opinion filed February 6, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00237-CV

_____

## IN THE INTEREST OF X.M.B.E., A CHILD

**On Appeal from the County Court at Law**
**Erath County, Texas**
**Trial Court Cause No. 23CVCC-00119**

### O P I N I O N

Section 263.401(b) of the Family Code allows a trial court to retain certain suits that involve the parent-child relationship on its docket *if* it makes the necessary findings. *See* TEX. FAM. CODE ANN. § 263.401(b) (West Supp 2024). In the underlying suit, the trial court proceeded to a final hearing, and ultimately terminated Appellant's parental rights, after it had denied Appellant's multiple requests to extend the automatic dismissal date. On appeal, we consider, among other things, whether the trial court, by denying Appellant's requests, properly applied the extension criteria set forth in Section 263.401(b-3). *See id.* § 263.401(b-3).

The genesis of this appeal originates from the trial court's decision to terminate the parental rights of the mother and father of X.M.B.E.[1] Only the mother, Appellant, has appealed from the trial court's order. She raises four issues on appeal contending that: (1) the evidence is legally and factually insufficient to support the trial court's termination finding under subsection (O) that she failed to comply with the provisions of her court-ordered family plan of service; (2) she proved by a preponderance of the evidence that she made a "good faith effort" to comply with her service plan requirements, and should not be blamed for her alleged noncompliance; (3) the evidence is legally and factually insufficient to support the trial court's finding that terminating her parental rights is in the child's best interest; and (4) the trial court abused its discretion by denying her requests to extend the automatic dismissal date. *See id.* §§ 161.001(b)(1)(O), (b)(2), (d), 263.401.

Because we conclude that the trial court abused its discretion when it refused to extend the dismissal date, we reverse in part and remand.

## I. *Factual and Procedural Background*[2]

On September 8, 2023, the Department of Family and Protective Services (the Department) was granted temporary managing conservatorship of X.M.B.E., and the child was thereafter placed with her paternal aunt and uncle in Burleson, Texas. At a status hearing on November 7, 2023, the trial court approved Appellant's and the father's family plans of service and adopted them as orders of the court. Appellant's family plan of service required her to:

- obtain and maintain stable, legal employment for six consecutive months prior to September 9, 2024, the automatic dismissal date, and provide proof thereof;

---

[1]We use initials to refer to the child. *See* TEX. R. APP. P. 9.8(b).

[2]Because of our disposition, we will not address Appellant's sufficiency complaints. As such, we limit our rendition of the facts to those which are necessary to resolve this appeal.

2

- obtain and maintain appropriate housing that provides a safe environment for the child;

- maintain regular contact with the Department and provide any change in address or telephone number within three days;

- complete a parenting skills course;

- complete a drug and alcohol assessment and follow the recommendations of the provider;

- submit to random drug testing within four hours of the Department's request;

- complete psychological and psychosocial evaluations;

- complete a mental health assessment through "MHMR"[3];

- participate in individual counseling; and

- complete a Victim's Intervention and Prevention Program (VIPP) assessment and comply with the issued recommendations.

The trial court held a permanency hearing on May 28, 2024. Bailey Markum, the assigned "permanency specialist with Our Community-Our Kids" (OCOK),[4] reported that Appellant had completed her parenting classes, a psychological evaluation, a psychosocial evaluation, was "participating in her counseling services," and "was successfully discharged" from VIPP counseling in March. Appellant and the father were living together in "clean and appropriate . . . stable housing," and Appellant was "employed cleaning houses." Appellant completed an initial drug and alcohol assessment in October 2023, but Markum submitted a referral for another assessment because Appellant and the father asked to change service providers. According to Markum, Appellant "has submitted to random drug

---

[3]"MHMR" refers to "state-provided mental health services." *See J.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-24-00159-CV, 2024 WL 3906786, at *5 (Tex. App.—Austin Aug. 23, 2024, no pet.) (mem. op.).

[4]Our Community Our Kids is a contractor that provides the Department with foster care and case management services. *See In re L.L.*, No. 02-23-00132-CV, 2023 WL 5767483, at *2 n.9 (Tex. App.—Fort Worth Sept. 7, 2023, pet. denied) (mem. op.).

testing when asked, and her last drug test was negative." Finally, Markum explained that Appellant's visits with the child "have been going great," and the unspecified "concerns during a couple of visits . . . have been addressed."

The Department's goal at the time of the permanency hearing was family reunification. At that time, Appellant had not yet completed her "mental health assessment with MHMR," and Markum explained that both parents needed to "fully engage in their drug and alcohol assessments and their substance abuse counseling." At the conclusion of this hearing, the trial court informed Appellant and the father:

> [Y]ou're both partially compliant with your service plan. You're doing almost everything I've asked. There are just a few hiccups along the way. You can address those and get past those, because if you don't, this isn't going to turn out very well, and I really want it to turn out.

> You've heard me say, I believe kids do best with their parents, and there is a good possibility that this child would be returned to you all. I want [X.M.B.E.] to return home to you all…. The goal is family reunification at this time.

The trial court then advised the parents that their parental rights could be terminated unless they were willing and able to provide the child "with a safe, appropriate, drug-free home environment."

On June 15, 2024, nearly three weeks after the permanency hearing, Appellant called the police to report that the father "had beaten her up." Officers John Duffield and Trevor Augustus with the Stephenville Police Department responded to the call and observed that Appellant had "a visible knot to her left eye area." Appellant was "visibly upset," but was not confrontational. The father, on the other hand, was confrontational and uncooperative, so the officers "had to use force" to detain him. Appellant told Officer Duffield that she and the father were arguing in their bedroom when "he slapped [her] three times in the face," "punched [her]," then "ended up biting [her]." After speaking to the father and observing that he had no visible injuries, the officers found Appellant's version of events to be credible and arrested

4

the father for assaulting Appellant. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b) (West Supp. 2024). An order for emergency protection was issued, and the father's criminal case was still pending at the time of the final hearing. *See* TEX. CODE CRIM. PROC. ANN. art. 17.292(a) (West Supp. 2024).

The parties appeared for the final hearing on August 27, 2024. At the outset, Appellant requested an extension of the automatic dismissal date, which was September 9, 2024. Appellant informed the trial court that the father had assaulted her in June, and that the protective order was still in effect. Because of the assault and her fear of other possible physical altercations with the father, "[s]he had to flee to Oklahoma" to live with her mother, which "caused a disruption in her services and an inability . . . to complete her service plan [requirements]." The trial court denied Appellant's initial extension request and found that "there [were] no extraordinary circumstances" because Appellant "still had at least nine months to complete her service plan."

At the final hearing, the Department presented the testimony of Markum and Officers Duffield and Augustus. According to Markum, Appellant had not maintained steady employment since the May 28 permanency hearing, and her "housing situation" had changed. Appellant "did have steady housing for a while" until she moved to Oklahoma to live with her mother, on whom she relies for financial support. Prior to that time, Appellant relied primarily on the father for financial support.

Markum testified that Appellant did not complete her substance abuse course or mental health assessment before moving to Oklahoma, but "did remain in contact with her counselor" who "helped her get in touch with MHMR in Oklahoma." Markum verified that Appellant "did go to MHMR, but [she did not] know if an assessment was done. . . . [She] was told that MHMR did not provide [any] recommendations, but [I have received] no word on whether an assessment was done

or not." During her testimony, Appellant confirmed that she sought mental health services in Oklahoma, but did not receive a mental health assessment for recommendations because "they don't do it." When she attempted to complete this service plan requirement, she "told them exactly what [Markum] told [her] . . . she wanted them to give a recommendation on stuff that [she] need[s] to do, and they told [her] that they do not give recommendations. It's a place you go to if you feel like you need the help."

Markum expressed her belief that X.M.B.E. would not be safe in Appellant's current home environment, but then explained the following:

> [MARKUM]: I have not had a chance to see the home to be able to give a judgment on that.

> [ATTORNEY AD LITEM]: Is it that you haven't been able to go out there and she cooperated, or what's the situation with that?

> [MARKUM]: So, with that, I have not been able to go out there and I was giving her some time once she moved up there to kind of get settled and everything, and then her mom was in an accident and required surgery.

> [ATTORNEY AD LITEM]: So you don't know what the home environment is like?

> [MARKUM]: No, ma'am.

On further cross-examination, Markum agreed that it "was no fault of [Appellant's]" that Markum had not seen the home in Oklahoma. Appellant testified that Markum never asked to inspect her mother's home there, and never asked "to do a walk-through with Zoom or something like that."

Appellant's last in-person contact with X.M.B.E. was on June 22, 2024. She relies on her mother for transportation, but her mother was involved in an accident on July 6, 2024. Markum stated that Appellant is "allowed Zoom visits and FaceTime calls with [X.M.B.E.]," but does not exercise these visitation options

6

regularly. However, Appellant testified that she had participated in video chats with X.M.B.E. and had never refused visits with her whenever it was offered.

Markum opined that it was in X.M.B.E.'s best interest to remain with her aunt and uncle because "[t]hat home is stable and able to provide her with everything that she needs," "[t]hey're loving, they're nurturing," and "[t]hey're all that she's known pretty much throughout this entire case." Markum further stated that it was not in X.M.B.E.'s best interest to return to Appellant "[d]ue to the stability factors as far as financial stability," and that she did not believe that Appellant had sufficiently addressed the reasons for X.M.B.E.'s removal. Markum never expounded on the reasons for the child's removal, and the Department did not offer the removal affidavit in support of its petition seeking temporary managing conservatorship of X.M.B.E. Likewise, Appellant's service plan was not offered at the final hearing—in fact, no relevant exhibits were offered—but the trial court nevertheless took judicial notice "of everything that's been filed in this case at all prior hearings."[5]

Appellant twice reurged her request for an extension of the dismissal date as the final hearing progressed: once during the Department's case-in-chief because "she had no control over the fact that Ms. Markum is now saying her home is not safe"; and a second time at the close of the evidence. The trial court denied both

_____

[5]Texas courts have repeatedly expressed concerns regarding underdeveloped records in parental termination cases and find themselves reiterating that "none of the [matters presented at] previous hearings constitute evidence that can support the trial court's order terminating a parent's rights." *See In re E.F.*, 591 S.W.3d 138, 142 n.4 (Tex. App.—San Antonio 2019, no pet.) ("Given the constitutional rights of the parents in these proceedings, the future placement of the children involved, and the effect such placement will have on their lives . . . we urge the trial court and the parties to more completely develop the evidence at trial, so the appellate record is commensurate with the finality of parental termination."); *see also In re Z.R.M.*, 665 S.W.3d 825, 829 n.6, 831 (Tex. App.—San Antonio 2023, pet. denied) (collecting cases and "reluctantly conclud[ing] . . . that the evidence is legally and factually sufficient to have permitted the trial court['s]" best interest finding despite the paltry record); *In re M.A.J.*, 612 S.W.3d 398, 417 n.24 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *In re M.R.*, No. 13-22-00304-CV, 2022 WL 17844215, at *5–6 (Tex. App.—Corpus Christi–Edinburg Dec. 22, 2022, no pet.) (mem. op.) (The best interest determination was not supported by sufficient evidence, which "spanned only approximately fifty-eight pages of the reporter's record, contained only one exhibit which was unrelated to [the appellant-mother], and included testimony from only two witnesses."). "The only evidence that can support the trial court's order is [the] evidence admitted at trial." *E.F.*, 591 S.W.3d at 142 n.4.

requests and explained that it had "handled this case from the very beginning" and "handled every court hearing," and is "familiar with this family and the facts that brought . . . this child . . . into the Department's care." Despite its observation that "the Department could have worked a little harder at the end" to return X.M.B.E. to the parents, the trial court terminated Appellant's parental rights under Section 161.001(b)(1)(O) and found termination to be in the best interest of X.M.B.E. This appeal followed.

## II. *Discussion*

In her fourth issue, which we conclude is dispositive, Appellant asserts that the trial court abused its discretion when it denied her requests to extend the automatic dismissal date pursuant to Section 263.401(b). *See* FAM. § 263.401(b). We review a trial court's decision to grant or deny an extension requested under Section 263.401(b) for an abuse of discretion. *In re L.C.C.*, 667 S.W.3d 510, 516 (Tex. App.—Eastland 2023, pet. denied) (citing *In re M.G.*, 585 S.W.3d 51, 58 (Tex. App.—Eastland 2019, no pet.)). A trial court abuses its discretion by acting unreasonably or arbitrarily, or by misapplying the law to the established facts of the case. *In re D.W.*, 249 S.W.3d 625, 647 (Tex. App.—Fort Worth 2008, pet. denied); *see Huynh v. Blanchard*, 694 S.W.3d 648, 674 (Tex. 2024); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). However, a trial court does not abuse its discretion "when it simply exercises that discretion in a different manner than reviewing appellate courts might." *Low v. Henry*, 221 S.W.3d 609, 620 (Tex. 2007).

### A. *The Purpose of Section 263.401(b-3)*

In a parental termination proceeding, a trial on the merits must commence by "the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." FAM. § 263.401(a). The failure to comply with this deadline without a valid

subsection (b) extension deprives the trial court of jurisdiction over the suit, and results in its automatic dismissal. *Id.* Section 263.401(b) permits the trial court to retain the suit on its docket only *if* the trial court finds that: (1) "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the [D]epartment"; and (2) "continuing the appointment of the [D]epartment as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b).

"[A]ctions that [are caused by and] considered to be the parent's fault will generally not constitute extraordinary circumstances." *In re M.S.*, 602 S.W.3d 676, 680 (Tex. App.—Texarkana 2020, no pet.) (internal quotation marks omitted) (The mother's confinement was the result of her actions and was not an extraordinary circumstance.); *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *3 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.) ("[P]arents cannot blunder their way into extraordinary circumstances."). For example, a parent's failure to timely begin his or her service plan requirements does not constitute an extraordinary circumstance. *See, e.g.*, *In re J.M.*, No. 02-21-00346-CV, 2022 WL 872542, at *4 (Tex. App.—Fort Worth Mar. 24, 2022, no pet.) (mem. op.) ("Father's inability to complete services because of and after his incarceration was the consequence of his own actions," and thus was not an extraordinary circumstance.); *see also In re H.S.*, No. 02-23-00367-CV, 2024 WL 1207304, at *16–17 (Tex. App.—Fort Worth Mar. 21, 2024, pet. filed) (mem. op.) (the mother's failure to timely begin working her service plan did not constitute an extraordinary circumstance) (citing *In re O.R.F.*, 417 S.W.3d 24, 42 (Tex. App.—Texarkana 2013, pet. denied)).

Consequently, if a parent, by choice, fails to comply with a service plan and then moves for an extension of the statutory dismissal date to complete the plan's requirements, the trial court will not abuse its discretion if it denies the parent's extension request. *See S.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-

00476-CV, 2023 WL 402206, at *3 (Tex. App.—Austin Jan. 26, 2023, no pet.) (mem. op.) (citing *In re Y.G.*, No. 01-22-001810CV, 2022 WL 3362953, at *9 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, no pet.) (mem. op.)).

On appeal, Appellant relies on Section 263.401(b-3), claiming that she made a "good faith effort" to complete her service plan requirements. In 2021, the legislature amended Section 263.401 to include subsection (b-3), which provides:

> A [trial] court *shall* find under Subsection (b) that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department if:
>
> (1) a parent of a child has made a *good faith effort* to successfully complete the service plan but needs additional time; and
>
> (2) on completion of the service plan the [trial] court intends to order the child returned to the parent.

Act of Apr. 28, 2021, 87th Leg., R.S., ch. 8, § 9, 2021 Tex. Sess. Law Serv. 10, 15. (emphasis added). Because of its recent enactment, judicial guidance concerning the proper construction and application of subsection (b-3) is scant. As such, we believe that an interpretation of subsection (b-3)'s purpose and intent is required.

"Statutory construction is a question of law, and review is conducted de novo." *City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 133 (Tex. 2013). "Our ultimate purpose when construing a statute is to discover the Legislature's intent," and the statute's text is the best indication of such intent. *Id.*

The phrase "good faith effort" in the context of a parent's compliance with their court-ordered service plan is also found in Section 161.001(d) of the Family Code. *See* FAM. § 161.001(d). We presume that the legislature enacted Section 263.401(b-3) consistent with, and knowledge of, the prevailing judicial understanding of "good faith effort" as that phrase has been interpreted under Section 161.001(d)(2). *See JCB, Inc. v. Horsburgh & Scott Co.*, 597 S.W.3d 481, 486 (Tex. 2019) (construing statutory text under the presumption that the legislature

10

enacted the statute "with full knowledge of the existing condition of the law," including common law, "and with reference to it") (quoting *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677 (Tex. 2007)).

"In ascertaining a term's meaning, courts look primarily to how that term is used throughout the statute as a whole." *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). Therefore, statutory terms should be interpreted consistently in every part of a statute. *Id.* To that end, we look to relevant judicial interpretations as to what constitutes a parent's "good faith effort" to comply with the provisions of a court-ordered service plan under Section 161.001(d)(2). *See In re Facebook, Inc.*, 625 S.W.3d 80, 92 (Tex. 2021) ("[W]hen faced with a statute that reasonably lends itself to multiple readings, we promote stability and predictability in the law by adopting the position unanimously taken by other courts if the text permits.").

We first note, however, that Section 161.001(d)(2), in addition to requiring a parent's "good faith effort" to comply with his or her service plan, includes a provision that the parent's alleged noncompliance cannot be "attributable to *any* fault of the parent." *See* FAM. § 161.001(d)(2) (emphasis added). Of particular significance is the absence of a no-fault requirement in Section 263.401(b-3). We recognize that a "good faith effort" necessarily entails, to some degree, a lack of culpability for a parent's noncompliance. Nevertheless, the mandate of subsection (b-3) is clear: if a parent has made a "*good faith effort*" to comply with his or her service plan and in turn needs additional time to satisfy the plan's requirements, and the trial court intends to return the child to the parent upon the parent's completion of the service plan, the trial court *shall* find that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the Department. FAM. § 263.401(b-3).

B.  *Section 263.401(b-3): Extraordinary Circumstances*

We and several of our sister courts have addressed a panoply of parents' excuses for their failure to complete their service plans, and have made it clear that a parent's obstinance, apathy, intentional delay, or outright refusal to engage in services is the antithesis of a "good faith effort."  *See, e.g.*, *In re Z.R.E.B.*, No. 11-23-00233-CV, 2024 WL 968965, at *6 (Tex. App.—Eastland Mar. 7, 2024, no pet.) (mem. op.) (The mother's incarceration for the first seven months while the case was pending did not excuse her "persistent disregard of other material requirements" after her release.); *In re B.R.T.*, No. 04-22-00416-CV, 2023 WL 29381, at *3–4, *6 (Tex. App.—San Antonio Jan. 4, 2023, no pet.) (mem. op.) (The mother did not establish that she made good faith efforts because her noncompliance was due to her choice to reschedule appointments and drug tests, and she did not maintain employment because she was pregnant.); *In re B.A.*, No. 09-20-00216-CV, 2021 WL 1217334, at *8–10 (Tex. App.—Beaumont Apr. 1, 2021, no pet.) (mem. op.) (The father did not make a good faith effort to comply with service plan—he gave "pushback," "did not make any efforts to work services," and did not take it seriously.).  On the other hand, parents' compliance with their service plans "as far as [they are] able to under the circumstance[s]" will generally constitute "good faith efforts."  *In re A.D.*, No. 12-17-00334-CV, 2018 WL 6191116, at *7 (Tex. App.—Tyler Nov. 28, 2018, no pet.) (mem. op.); *see also In re J.R.*, No. 11-24-00185-CV, 2024 WL 5160456, at *4–6 (Tex. App.—Eastland Dec. 19, 2024, no pet. h.) (mem. op.) (incarcerated father made a good faith effort to comply with his service plan because he "completed the services made available to him" in jail, "and his noncompliance was attributable to his pretrial confinement").

The Third Court of Appeals addressed the propriety of a parent's request for an extension of the dismissal date due to the parent moving from Texas during the pendency of the case.  *See S.B.*, 2023 WL 402206, at *3.  In *S.B.*, the mother moved

12

to Michigan three months before the final hearing "without the court's approval," and could not afford to pay for services there that were otherwise "provided free of charge in Texas." *Id.* The mother also never obtained employment or housing and had only seen her child once—a communication via Zoom—since she moved to Michigan. *Id.* The trial court denied the mother's extension request. *Id.* On appeal, the court held that the trial court "could have reasonably determined that [the mother] waited too long to begin trying to comply with her service plan and that any impediment to her completing her services was a result of her own decision to move outside of Texas." *Id.*

The circumstances in *S.B.* are distinguishable from the matter before us— namely, Appellant's reasons for moving from Texas to Oklahoma, and her genuine attempts to complete her service plan requirements after moving there. Appellant had complied with all but a few of her service plan requirements before the father assaulted her in their home. The Department described this encounter as "a spectacular physical blow-up where [the father] brutally assaulted [Appellant]." Thus, this attack alone could arguably have been deemed an extraordinary circumstance in and of itself. As a result, and suddenly without housing, transportation, and financial support, Appellant sought refuge with her mother. While in Oklahoma, based on her counselor's and Markum's directions, Appellant located mental health services—"just not in the way that suited the Department." *See In re R.J.G.*, 681 S.W.3d 370, 383 (Tex. 2023) (finding insufficient evidence for termination of the mother's parental rights based on the mother's noncompliance with her service plan).

Markum also conceded that she was not "able to give a judgment on" the safety and stability of Appellant's current living arrangement because she "was giving [Appellant] some time . . . to kind of get settled." This is, therefore, not a typical scenario in which a parent chose and intended not to comply with their

13

service plan. *See S.B.*, 2023 WL 402206, at *3. Even with Appellant's unforeseen upheaval, she nevertheless made genuine attempts and took affirmative steps to comply with the provisions of her court-ordered service plan pursuant to Section 263.401(b-3)(1). Further, assuming that "parental fault" is or should be a relevant consideration in this analysis, and we do not hold that it is, we cannot say that Appellant created the circumstances that necessitated her extension requests. In this instance, the uncontroverted evidence shows that Appellant made a "good faith effort" to comply with the requirements of her service plan and needed additional time to do so.

Moreover, and importantly, we note that the trial court expressed a clear intention to return X.M.B.E. to Appellant upon Appellant's completion of her service plan's requirements. *See* FAM. § 263.401(b-3)(2). As set forth above, the trial court advised Appellant and the father during the May 28 permanency hearing that "there is a good possibility that [X.M.B.E.] would be returned" to them if they addressed certain concerns and completed their service plan requirements. Indeed, circumstances can and do change throughout the pendency of termination proceedings, and the Department may ultimately present clear and convincing evidence that termination of Appellant's parental rights is necessary. However, when Appellant first requested an extension of the dismissal date, other than Appellant's proffer that she "had to flee to Oklahoma" after being assaulted by the father, no evidence to support the Department's basis for termination had been presented to the trial court. Further, even after hearing all the testimony that corroborated Appellant's arguments, the trial court lamented: "I hate this for [X.M.B.E.]. I get no joy out of making this finding . . . . I wish this had worked out differently." Therefore, we conclude that the second requirement of subsection (b-3)—the trial court's intent to return the child to the parent upon the parent's completion of the service plan—has been met.

14

Here, the record shows that (1) Appellant made a "good faith effort" to comply with and complete her service plan requirements, (2) she needed additional time to do so, and (3) the trial court intended to return X.M.B.E. to Appellant upon the completion of her service plan. FAM. § 263.401(b-3). In that regard, and because of the trial court's expressed intention, pursuant to the clear directive of subsection (b–3), it was required to find that extraordinary circumstances existed for X.M.B.E. to remain in the temporary custody of the Department. *Id.* The trial court abused its discretion when it did not so find.

C. *Section 263.401(b): Best Interest of the Child Finding*

An extension of the dismissal date is not required based on a finding of extraordinary circumstances alone—it must also be in the child's best interest to "continu[e] the appointment of the department as temporary managing conservator." *Id.* § 263.401(b).

For clarity, we note that both Appellant's and the Department's briefs refer to matters and statements that are included in the removal affidavit attached to the Department's original petition seeking temporary managing conservatorship of X.M.B.E. As we have discussed, the Department presented *no* evidence at trial to address the reasons for X.M.B.E.'s removal. Moreover, the trial court's judicial notice of its file and records cannot encompass the *truth* of the allegations in such material. *M.G.*, 585 S.W.3d at 57; *In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.); *Tschirhart v. Tschirhart*, 876 S.W.2d 507, 508 (Tex. App.—Austin 1994, no writ). For example, a trial court may *not* take judicial notice of the truth of a removal affidavit's factual contents. *See J.E.H.*, 384 S.W.3d at 870); *see also In re B.D.A.*, 546 S.W.3d 346, 363–64 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (collecting cases regarding judicial notice); *In re T.J.*, No. 11-19-00259-CV, 2020 WL 746765, at *3 (Tex. App.—Eastland Feb. 13, 2020, no pet.) (mem. op.) (Because the removal affidavit was not admitted at trial, it "cannot be

15

considered by this court, nor could it have been considered by the trial court."). That is not to say that a removal affidavit may never be relevant; it may be considered in some circumstances, such as to show "what the trial court relied on in determining whether removal was justified." *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). However, even if we assume that the trial court did consider the affidavit, we nevertheless conclude that extending the automatic dismissal date was justified and in X.M.B.E.'s best interest.

The legislature enacted Section 263.401 to encourage the prompt resolution of Department-initiated termination proceedings. *In re G.X.H.*, 627 S.W.3d 288, 292 (Tex. 2021). In determining whether to grant an extension under Section 263.401(b), the focus and paramount consideration is on the needs of the child. *In re J.S.S.*, 594 S.W.3d 493, 501 (Tex. App.—Waco 2019, pet. denied); *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied). In opposing Appellant's extension requests and in support of its reasons for termination, the Department primarily relied on the stability of X.M.B.E.'s placement, even calling them her "new family." But the child's needs are generally presumed to be best served in the care of a *parent* who has demonstrated the ability to act in the child's best interest. *See* FAM. § 153.001 (Texas public policy is to "assure that children will have frequent and continuing contact with *parents* who have shown the ability to act in the best interest of the child.") (emphasis added).

The evidence presented by the Department at the final hearing focused, to a degree, on the father's violence and positive drug tests, as well as Appellant's recent move to her mother's home in Oklahoma, a home that the Department never visited. In light of Appellant's requests, the trial court had three opportunities in which to extend the automatic dismissal date, including after evidence had been presented that substantiated Appellant's good faith efforts and reasons for the disruption in her services. The automatic dismissal date had not previously been extended, and the

16

Department's sole ground for seeking to terminate Appellant's parental rights was her failure to comply with her service plan requirements. We are mindful of the "potential misuses of (O)," and the supreme court's caution against terminating the parent-child relationship based on a trial court's subsection (O) finding or a parent's status as a victim. *See In re A.P.*, 672 S.W.3d 132, 137 (Tex. 2023) (Young, J., concurring); *In re A.L.R.*, 646 S.W.3d 833, 836 (Tex. 2022) (per curiam). In this case, Appellant, X.M.B.E.'s biological mother, actively pursued and participated in services both before and after the father assaulted her. Based on the circumstances before us, Appellant's requests for additional time to continue her efforts to meet her service plan requirements with the hope of preserving the parent-child relationship indicate that it was in X.M.B.E.'s best interest at the time to continue the appointment of the Department as her temporary managing conservator while Appellant strived to comply. The trial court abused its discretion by implicitly finding otherwise when it denied her extension requests.

"[T]he choices the Legislature made in crafting and amending the text of Section 263.401" further reinforces our conclusion. *See In re J.S.*, 670 S.W.3d 591, 597 (Tex. 2023) ("The starting point for determining statutory meaning is to examine both the literal text and its context; and *part of the statutory context includes the history of the statute in question*.") (quoting *Stredic v. State*, 663 S.W.3d 646, 659 (Tex. Crim. App. 2022)). The legislature has amended Section 263.401 four times since 2005 to emphasize "the hefty stakes of these proceedings . . . which incorporate heightened protections against government interference with parents' fundamental liberty interest in the care, custody, and control of their children." *J.S.*, 670 S.W.3d at 599. "In recognition of this interest, all branches of Texas government have implemented strong due-process protections for parents facing termination of their parental rights." *Id.* And "[w]e are not at liberty to provide trial

courts with more flexibility in these cases than the Legislature clearly specified they should have." *Id.* at 600.

We conclude that the trial court abused its discretion when it denied Appellant's requests to extend the automatic dismissal date. Accordingly, we sustain Appellant's fourth issue. Because the resolution of this issue is dispositive of this appeal, we need not reach the other issues raised by Appellant. *See* TEX. R. APP. P. 47.1. Further, our holding does not alter the trial court's appointment of the Department as X.M.B.E.'s managing conservator. *See In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007).

### III. *This Court's Ruling*

We reverse the order of the trial court insofar as it terminated Appellant's parental rights, and we remand this cause to the trial court for further proceedings consistent with this opinion. *See* TEX. R. APP. P. 44.1(b). Any proceedings on remand must be commenced within 180 days of this court's mandate. *See* TEX. R. APP. P. 28.4(c).

W. STACY TROTTER
JUSTICE

February 6, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

18