# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00738-CV

---

**D. F. and W. C., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
### NO. 24-0069-CPSC1, THE HONORABLE JOHN MCMASTER, JUDGE PRESIDING

---

## O P I N I O N

Following a jury trial, appellants D.F. (Mother) and W.C. (Father) appeal from the trial court's order terminating their parental rights to their daughter, Riley, who was six at the time of trial, and Mother's parental rights to her son, Ricky, who was four at the time of trial and whose biological father's rights were terminated in an earlier case.[1]  Father's parental rights were terminated under Texas Family Code subsections 161.001(b)(1)(D), (E), and (P).  Mother's parental rights were terminated under subsections 161.001(b)(1)(D), (E), and (O).  And the order of termination concluded that termination of both parents' parental rights was in the best interest of the children.  *See* Tex. Fam. Code § 161.001(b)(2).  We will affirm the order of termination.

---

[1] We refer to appellants as Mother and Father and to the children by aliases.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  We refer to the other family members involved in this case by aliases.  *See* Tex. R. App. P. 9.8(b)(2).

# BACKGROUND

This case began in May 2024, when the Department received a referral for concern of Ricky, then three, and Riley, then five, after Mother was arrested by Round Rock Police Department officers for possession of methamphetamine. Before seeking removal of the children, the Department struggled to consistently communicate with Mother, as she refused to disclose her location or cooperate, saying that she would not "make this easy" for the Department. In its periodic contact with Mother between May and August 2024, the Department learned that Mother admitted to relapsing, refused to timely drug test at a Department-approved facility or by hair test, and was homeless with her two children. Mother maintained that she had been "couch surfing" with friends, but she refused to provide an address for herself or the children and refused to participate in any services through the Department. Mother agreed to provide a urinalysis at the location and time of her choosing, and those tests came back negative for all substances.

By August 2024, Mother told the Department that she did not feel well enough to care for her children, was struggling to stay sober, and had left her children with her brother, Devin, and his wife, Alison. But when the Department contacted Devin and Alison to verify that the children were with them, Mother had already retrieved the children. Mother said she would drop the children off at Devin and Alison's home on August 16 but again did not follow through and instead kept the children with her. By the end of August, Alison expressed concern that the children "could already have been enrolled in school" if Mother had dropped the children off as planned and expressed Devin's concern that Mother appeared to be actively using methamphetamine.

On September 2, the Department contacted Mother to assess the children's safety. Mother declined to submit to a drug screen and insisted on being present for the children's

2

interviews, during which Riley looked to Mother repeatedly while answering questions. Mother admitted that she was "not in the right place to be a good parent" to the children now, and Devin reiterated his concerns about Mother's drug use. The next day, the Department sought and obtained an order for the removal of the children based on its concern for the safety of the children due to Mother's "erratic behaviors, housing instability, lack of cooperation with the Department, prior removal of these children by the Department, continued criminal behavior, and continued substance use despite the Department providing extensive rehabilitation" during a previous case that ended in October 2022 with the children being returned to Mother after she completed services.

The Department placed Riley and Ricky in Devin and Alison's home while this case proceeded. Devin and Alison have two biological children, who were seventeen and twenty-two at the time of trial, and are fostering three children of "more distant" relatives, who Devin noted were with them "due to parents' drug use, alcohol, [and] addiction" as well. Ricky and Riley have stayed with Devin and Alison in the past, including for over a year when Ricky was a newborn during the Department's prior investigation and while Mother received services. After that case closed, Devin said that the plan was for the children to stay in their school and daycare but that when the children were returned to Mother, "she took them out of school and daycare and took off" without telling him or Alison where she and the children were going. Devin characterized Mother as "hard to deal with" and "all over the place. She can be nice one day and the next day she just – she'll get mad and not talk to you for two or three months." Devin testified that Mother has had a drug problem "for a long time," and he can tell when Mother is using drugs again because she will drop the children off to stay at his and Alison's house.

3

At trial, Mother explained that as a young adult, she "got involved, caught up in" "a murder case" along with her brother (not Devin) and pleaded guilty to being an "accessory after the fact," for which she served ten years in federal prison. When Mother went to prison, she had one child and was pregnant with another. Mother's parental rights to these children were terminated while she was incarcerated, and both children's biological fathers have since died.

After Mother was released from prison in 2018, she moved to a halfway house in Houston, where she met Father. Father had also just been released after serving fifteen years in federal prison for offenses including possession with the intent to distribute and possession of a firearm during trafficking. Mother says she did not know Father's criminal history at the time. The evidence at trial established Father's multiple criminal convictions before he met Mother: a "marijuana charge" in 1999; misdemeanor harassment in 2000; escaping from custody in 2000; second-degree felony robbery in 2001; and the federal offenses for which he was sentenced to fifteen years' incarceration in 2004. Mother and Father began a relationship, which Mother characterized as something that was "supposed to be" "just a hookup, but it turned into a relationship that obviously didn't last long." Mother became pregnant with their child, Riley, before she learned that Father was married. Father left the halfway house but was soon arrested and later pleaded guilty to aggravated assault with a deadly weapon and assault on a family member—his wife—including strangulation. Mother emphasized that Father was "never violent towards [her]."

By the time Riley was born in November 2018, Father was incarcerated for new federal charges: violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, *see* 18 U.S.C. §§ 1961–1968, based on his leadership in a white supremacy gang and violent crimes in aid of racketeering related to an attempted murder. Mother visited Father and brought Riley to

4

Father's sentencing hearing, which was the first and only time Father met Riley in person. Father was convicted of these charges and sentenced to life in prison in December 2022 and January 2023. He is serving his sentence at the federal "supermax" penitentiary in Colorado. He acknowledges that "it's been a couple of years" since he talked to Riley, as he has not been granted permission to have a phone call with her. Mary Rivera, the children's therapist since October 2024, opined that Father should not have phone calls with Riley "until she was ready" and that Riley "continues to say, 'I'm not ready[,] and I don't want to talk about him.'" Instead, Rivera worked with a representative at the prison to help Father understand how to write letters to Riley by drawing pictures and using simple sentences. Throughout this case, Father wrote Riley "three or four letters" through Rivera, which Rivera agreed were appropriate. In sum, Father maintains that it is important for him to keep his parental rights "[t]o be able to be in [Riley's] life, to let her know that her father – that I love her. That's what I want her to know." His plans to parent Riley are to "just encourage her, you know, through life, just to be there for her and ask her about school and stuff like that."

After Riley was born, Mother began a relationship with another man, who fathered Ricky, born in January 2021. Ricky's father was "very" violent toward Mother. Mother acknowledges that Riley witnessed this domestic violence, testifying "it's traumatized her, scared her," and that she knows it has impacted Riley. The fathers of her first two children were also violent with Mother, and Mother "absolutely" had concerns about the fact that three of the four fathers of her children assaulted her. However, Mother insisted that "I don't pick abusive men anymore." Mother testified that she understood Father was charged as a "ringleader" of a gang and "attempted murder of another inmate," but she had no concerns with Father having a relationship with Riley because Father is not violent towards Riley.

5

Mother acknowledged her long history of drug abuse. She testified that she began using marijuana when she was nine, cocaine when she was ten or eleven, and methamphetamine when she was twelve or thirteen. Mother stated that as a child, "it felt like the only way I could get my mother to accept me was to get high because she was an addict. The only time we ever got along is whenever we were getting high together." Though Mother maintained that she did not use drugs once she knew she was pregnant, she admitted that during each of her four pregnancies she used drugs in the months before she knew that she was pregnant. For example, she testified that she found out she was pregnant with Ricky when she was over six months pregnant and had been using drugs during those six months. Mother has been to rehab multiple times before (though she has not always completed the program) and at trial testified that she had been sober since February 2025, when she detoxed before attending a rehab program. Though Mother stated "it's exhausting" to be sober, she maintained she has stayed sober "because I want my children. I want to be a better person."

Donna McIntire, the CASA volunteer, expressed skepticism with Mother's sobriety, opining that she saw "no difference at all" between Mother at trial versus before she went to rehab, citing Mother's speech, body movements, and "twitching in the chair." Ifunanya "Anita" Ohanuzue, the Department's caseworker, testified similarly, noting that she does not believe that Mother is "clean, safe, stable, [and] sober." Father testified that he was aware of Mother's substance abuse history and had once written Mother a letter asking her to go to rehab, "which I think she did," but had learned from the Department that Mother had been arrested again for drug-related offenses that led to this case. He testified that "there's nothing I can do from in prison" to protect Riley from Mother's "bad behavior."

6

As for housing, Mother testified at trial that she has lived at a new address in San Antonio for the past three months but had not provided her new address to the Department. Before that, Mother said she had rented a house, then "was homeless for a little while." The Department introduced into evidence photos of Mother's prior residence, which showed "disarray" with "a lot of bulk items around," "a lot of trash in the front," "a broken-down car," and windows that "looked like they were not able to close." Monique Garcia, one of the Department's caseworkers who took photos of the house, testified that it did not appear to be habitable. Garcia tried to contact Mother at that house, but she was not there; however, Garcia testified that based on her observations, she believed that Mother was still living there. Mother maintained she had not lived at that house since May. Ohanuzue said that Mother had not provided any names of her housemates for the Department to do a background check. Mother said, "I don't ask their business" regarding "drug histories or domestic violence histories." In response to the concerns that Mother withdrew her children from school and daycare after they were returned to her following the Department's last case and left without providing a forwarding address, Mother insisted that "nobody else needs to know where I'm going with my kids."

The evidence at trial reflected that Mother's employment history has been limited and inconsistent. While in prison, Mother "ran a warehouse" and took business vocational training and psychology courses. She also got her personal trainer's license. However, she was at the time of trial cleaning houses, a job for which she makes her own schedule each week, which "depends on where I'm at mentally." This has impacted her ability to financially provide for her children, as her income has fluctuated, though Mother maintained that she is willing to pay for "whatever the kids need."

7

Mother also has struggled with mental-health issues. She testified that her cousin and her father died within three weeks of one another during the Department's investigation in this case, which was very difficult for her. She opined that the Department's investigator during this time "made me feel rushed and pressured" that if she did not "meet him right when he wanted me to, . . . they were going to come take my kids." She cited stress, anxiety, and depression as her relapse triggers, testifying that she began using methamphetamine again a few months after Ricky was born because her grandfather died, she was suffering from postpartum depression, and Ricky's father was "harassing me." She reflected that using methamphetamine was "the only thing I knew," noting "I don't handle emotions well. . . . It's something I'm just figuring out." Still, Mother insisted "my kids were not with me when I did relapse." And Mother said if she relapses in the future, she will "go right back to rehab." Mother agreed that for now, it was in her children's best interest to stay with Devin and Alison "because I know I'm not in a good place mentally right now, that's the best choice for them," and "right now I'm not good for them. And I know this." She stated:

> I fight every day to become a better person for [my children]. And it's hard. I feel so defeated. It hasn't been easy since I've been out of prison. It's been very hard. To get adjusted out here after being gone for so long, and get out, and just have these hurdles, one after another. I'm tired. I'm tired. It's just taking me so long to bounce back this time.

Mother became emotional during examination on the second day of trial and would not answer additional questions or attend another day of the trial.

Despite Mother's challenges, the testimony was unequivocal that Mother loves the children and the children love her. Mother testified, "me and my daughter are super close . . . . She's my everything. She's my best friend. The smile on her face when she sees me, it just brings

me so much joy. The same for my son. He's a firecracker but that's my baby." Urging the jury not to terminate her parental rights, Mother said:

> I want [the jury] to let me at least be a part of my children's life. I'm not asking for my kids right now. I just want to be in their life. I want – I want them to – I don't know. I just want them. I need them. Just like they need me. . . . I don't even want to take them for the weekends. I just want to go spend some time with them on the weekends[.]

Myra Morales, the Department's child safety specialist, agreed that "it's commendable for a mother to be able to say as much as she wants her children with them, it's better for them to be with relatives while I deal with my issues." However, some witnesses at trial noted that Mother did not appear to be working on her issues in earnest. For example, McIntire, the CASA volunteer, noted that when she first discovered Mother was "living out of a beat-up SUV that had a busted-out back window," she and Ohanuzue provided Mother with a list of sober-living facilities, including one based in Austin that offered Mother a two-week scholarship and transportation from San Antonio. Despite this offer, McIntire testified that Mother "was off the map," and "we didn't know how to get ahold of her," so the scholarship offer was rescinded. Ohanuzue testified that Mother later "said she just took a quick trip to the coast." Mother testified otherwise, saying that the Department told her they could not help her with housing. She also maintained that she moved out of the home that she had been living in with her father before he died because other residents in the house "were actively using drugs," and "I couldn't put myself in that situation to relapse again," even though it meant she would be homeless.

The Department provided both Mother and Father with service plans, and Ohanuzue testified to both Mother's and Father's compliance with their respective service plans. As for Mother, Ohanuzue testified that Mother had not responded to requests for drug tests since

9

May and had taken just four tests total. Ohanuzue also maintained that the Department had not been able to consistently communicate with Mother. For example, Ohanuzue testified that Mother confirmed every visit with the children "within minutes" by text but that Mother did not respond to her email inquiries unless her attorney and other case contacts were copied. Ohanuzue also noted that Mother had not asked questions about the children's medical or dental care, educational providers, or records. McIntire similarly described her attempts to contact Mother, noting that it took Mother "several weeks" before she returned a phone call. Garcia echoed this concern, noting that she contacted Mother by phone, text, and email with information regarding referrals and drug-testing requirements but that Mother had not submitted to any of the required tests.

Mother insisted that the Department had not been helpful or communicative during the case. Mother testified that she attended a detox program, then went to a rehab program that was covered by her insurance that she found on her own "because I couldn't get nobody else to help me." Mother maintained that she had lost her copy of the service plan while moving but that she is "in therapy" and completed the psychological evaluation.

In Mother's prior case with the Department, which resulted in the children being returned to her through a mediated settlement agreement, Ohanuzue stated that Mother appeared "to have done what she needed to do to be a safe and appropriate parent." Here, "the plan was to continue to provide services, therapy, ensure she has a stable home, stable income, [is] clean, at least her drug test results [are] clean, and the children [are] able to return home through that" because "we believed the children will reunify with [Mother] so we had all these providers to accommodate that plan, achieve that goal." However, Ohanuzue maintained that Mother had not "achieve[d] that goal" of establishing "some type of stability" or demonstrating that she is "a safe and appropriate parent" in this case.

10

Victoria Caylor, Mother's therapist since May 2025, testified that she reviewed Mother's psychological evaluation from this case and developed a treatment plan with Mother to address her issues, which included anxiety, depression, parenting, personality disorders, and substance abuse, among others. Caylor opined that "it's really hard for [Mother] to take responsibility, for her to be accountable for her own actions, her own behavior," and that she has not found Mother to be truthful. For example, Caylor said Mother had told her that she did not have insurance to go see a psychiatrist but learned at trial that Mother's insurance had paid for her substance abuse treatment a few months ago.

As for Father, Ohanuzue testified that "it's almost up to the prison to decide what services he can do," but that the Department has provided "all reasonable services and opportunities to [Father]" and has been able to communicate with Father through his caseworker at the prison. Father testified that his ability to take advantage of services at the prison is limited due to the facility's security. Though he has access to weekly therapy sessions, he can only "sign[] up for classes," and "it's on them to let me go to class." Father testified that he had signed up to take a psychology class but because of the security requirements at his facility, each inmate must be in his own "cage," and "there's only six cages to a classroom," so he is on the waitlist. Father maintained that the Department had not sent him "packets of things to do" or asked for a release of his therapist's notes. Mother also testified that nothing has changed since the Department's prior case in which Father's parental rights were not terminated.

The undisputed testimony also established that Devin and Alison were a positive placement for the children. For example, Father stated that, "I know [Riley's] uncle and her aunt are very good people, so I mean, I know she's in good hands concerning that." He reiterated that "I would love for my daughter to live with her mother because, you know, they have a good

11

relationship and everything, but I'm okay with her living with her uncle." Likewise, Mother testified that "I just want them to be happy and healthy" and "to make sure they're safe. And I know they're safe right now." Mother also said that she is "very grateful for [Alison] for stepping in and helping me." Rivera, the children's therapist, agreed that the children feel safe at their current placement, as well as "happy" and "loved." Rivera also noted that Devin and Alison do not speak badly about Mother and Father, nor have they shared details about this case with the children, which she said prevents against any "false hope they may go back with the parents." Morales, the Department's child safety specialist, agreed that Devin and Alison "still spoke very highly of mom when the children were around," "would ask how their parent-child visit with mom went," and reminded the children of Mother's birthday, asking the children if they wanted "to do a card for her." She emphasized that Devin and Alison are "very family-oriented" and proactive when it comes to the children's medical and dental needs. McIntire testified that "they already are connected like a family" and that with Devin and Alison, the children have stability and security, like "knowing where I'm going to go every day, how I'm going to get to school, when I get home they're going to be there, I'm going to have my meals, my clothes are clean, my toys are there. That's what they have now."

Devin testified at trial that he and Alison want to adopt Riley and Ricky, who "mean everything to us." He focused on providing "a stable environment" for the children, as he has seen the impact of Mother's drug use and instability affect the children. For example, Devin remarked that the children would be "sad because they want to know . . . why is mom dropping us off over here and [we are] not going with her, why can't we go see her when we want to see her." Morales echoed this concern, stating "Having a parent come in and out and not having that stability when it comes to children that young, it's very consuming. . . . yes, we can tell them, [']Okay, this is

12

why you can't go back home, and these are the concerns that we have.['] But to them if they're continuously seeing mom and then out of nowhere it just stops, they have questions."

Testimony at trial established the children's progress since removal. Morales testified that after removal, Riley needed therapy and "intensive dental work." McIntire noted that Riley relayed a story to her "about the time they were living in a car during . . . December and January of last year, and she didn't like living in that car because it was cold outside" and "her mom would leave them alone in the car, and she would have to change her little brother's diaper before her mom showed back up." Similarly, Rivera testified that Riley talked to her about "living out of a car, not having food, having to change [her] brother's diaper," and "always taking care of her brother," which led Riley to be "always very worried and concerned about [her] brother." Rivera said Riley "was very confused" and "could possibly be retraumatized if she doesn't process the confusion and what is going on with mom, dad, or the whole background history." Rivera said that the "confusion of her emotions" "can add risk of high-risk behaviors as she becomes older" and could have some "developmental educational disruption" but that these are things she is working on with Riley in therapy.

In sum, the children "are very bonded to [Devin and Alison], as well as [Devin and Alison] to the children." Rivera stated, "Seeing and hearing how safe and happy they feel, and comparing the two, I would say that staying with who they're with now, they're getting their basic needs, a home, [Riley's] excited about going to school, there's consistency." Mother discussed allegations of an incident involving inappropriate touching by one of the other children in Devin and Alison's home, but Ohanuzue testified that the Department had previously learned of those allegations and had no concerns regarding that incident or the placement.

13

Other than Mother and Father, the remaining witnesses at trial testified that termination of parental rights is in the children's best interests and recommended that the children stay in their current placement with Devin and Alison. Even Father agreed that if it is necessary, he "would prefer [the children] be adopted by the aunt and uncle they're with now." Ohanuzue reiterated the Department's request to terminate parental rights, stating that with Devin and Alison, the "children have had structure" and "stability, they've had their needs met," "they are thriving," and "they are safe most importantly." And Devin noted that he and Alison would allow Mother to have contact with the children in the future, though that would depend on Mother's progress, which means, "for now," the amount of contact they would allow is minimal. Testimony also demonstrated that Devin and Alison would continue to permit Father to write Riley letters through her therapist.

The jury returned its verdict, and the trial court entered an order of termination based on the jury's findings. The trial court signed an order terminating Father's parental rights to Riley, finding by clear and convincing evidence that Father had knowingly placed or knowingly allowed his child to remain in conditions or surroundings that endangered her physical or emotional well-being, that Father had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being, that he had knowingly engaged in criminal conduct that has resulted in a conviction of an offense and confinement or imprisonment and inability to care for his child for not less than two years from the date of filing the petition, and that termination of the parent-child relationship was in the child's best interest. *See* Tex. Fam. Code §§ 161.001(b)(1)(D), (E), (P), (2). The order also terminated Mother's parental rights to Riley and Ricky, finding by clear and convincing evidence that Mother had knowingly placed or knowingly allowed her children to remain in conditions or surroundings

14

that endangered their physical or emotional well-being, that Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, that she had used a controlled substance in a manner that endangered the children, and that termination of the parent-child relationship was in the children's best interests. *See id.* §§ 161.001(b)(1)(D), (E), (O), (2). Mother and Father appeal.

## STANDARD OF REVIEW

"To terminate parental rights, the factfinder must find by clear and convincing evidence that (1) at least one of the termination grounds set forth in Section 161.001(b)(1) or other sections of the Texas Family Code applies, and (2) termination is in the best interest of the child." *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024). "Clear and convincing evidence 'will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting Tex. Fam. Code § 101.007). This "higher standard of proof" is required "[b]ecause the termination of parental rights implicates fundamental interests." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014).

An appellate court conducting a legal-sufficiency review in a termination-of-parental-rights appeal considers all evidence in the light most favorable to the trial court's finding, as well as any undisputed contrary evidence, to determine whether a reasonable factfinder could have formed a firm belief or conviction that it was true. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). "Courts 'must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so,' but courts 'should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *In re C.E.*, 687 S.W.3d at 308 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In a factual

15

sufficiency review in a termination-of-parental-rights appeal, the appellate court considers and weighs disputed evidence contrary to the trial court's findings against the evidence in favor of the finding. *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* However, appellate courts "provide due deference to the decisions of the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d at 503.

This appeal also raises issues of statutory construction, which we review de novo. *City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 133 (Tex. 2013). Our purpose when construing a statute is to effectuate the legislature's intent, and the best indication of that intent is the statute's text. *Id.*

## MOTHER'S APPEAL

Mother raises two issues on appeal, arguing that the Department (1) did not satisfy the statutory requirements regarding reasonable efforts to return the children to her and (2) failed to prove that termination was in the children's best interests.

### Reasonable efforts to return

Mother's first issue has two subparts. First, she argues that the Department did not present evidence regarding any of the reasonable efforts it made to return the children to her before seeking termination of her parental rights. *See* Tex. Fam. Code § 161.001(f). Second, she argues that the termination order failed to list any of those reasonable efforts with specificity as required by section 161.001(g). *See id.* § 161.001(g).

16

Texas Family Code subsections 161.001(f) and (g) are new statutory requirements to parental-rights-termination suits filed by the Department on or after September 1, 2023, and provide that:

> (f) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:
>
> > (1) the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent; . . .
>
> (g) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services in which the department made reasonable efforts to return the child to the child's home but a continuing danger in the home prevented the child's return, the court shall include in a separate section of its order written findings describing with specificity the reasonable efforts the department made to return the child to the child's home.

*Id.* § 161.001(f), (g). Here, the trial court ordered the termination of the parent-child relationship under subsection (b)(1) and thus its order must comport with subsections (f) and (g).

### a. Subsection 161.001(f)

Mother contends that the Department failed to present evidence regarding the reasonable efforts it made to return the children to her as required by subsection (f). She maintains that the only evidence the Department offered on this point at trial was testimony of its caseworkers "who struggled to maintain contact with [Mother] but still neglected to include her trial attorney in most email communications." Specifically, she argues that the Department neglected to "adequately administer" her service plan or provide her with a replacement copy when she lost hers, failed to dedicate time to communicating with Mother in ways that were effective for her,

17

and blamed Mother for poor communication and lack of follow-through on her drug-testing requirement. In sum, Mother's challenge focuses on the "reasonable efforts to return" portion of subsection (f).

Though subsection 161.001(f) is new to the Family Code, the phrase "reasonable efforts to return the child to the parent" is not new to section 161.001, as it appears in subsection 161.001(b)(1)(N), known as the "constructive abandonment" predicate ground. *See id.* § 161.001(b)(1)(N); *In re M.N.M.*, 708 S.W.3d 321, 328 (Tex. App.—Eastland 2025, pet. denied). We presume that the legislature enacted this amendment "with full knowledge of the existing condition of the law and with reference to it." *JCB, Inc. v. Horsburgh & Scott Co.*, 597 S.W.3d 481, 486 (Tex. 2019) (quoting *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677 (Tex. 2007) (orig. proceeding)). So, when considering whether the Department proved by clear and convincing evidence that it made reasonable efforts to return the children to Mother, we look to relevant jurisprudence construing the Department's reunification efforts under subsection 161.001(b)(1)(N). *See In re M.N.M.*, 708 S.W.3d at 328–29 (citing *In re Facebook, Inc.*, 625 S.W.3d 80, 92 (Tex. 2021)). Our sister courts of appeals that have examined subsection 161.001(f) have reached this same conclusion. *See, e.g.*, *id.* at 328; *In re K.N.S.*, No. 12-25-00171-CV, 2025 WL 3724545, at *9 (Tex. App.—Tyler Dec. 23, 2025, no pet. h.) (mem. op.); *In re M.B.*, No. 14-25-00418-CV, 2025 WL 3275376, at *8 (Tex. App.—Houston [14th Dist.] Nov. 25, 2025, no pet. h.). "Generally, implementation of a family service plan by [the Department] is considered a reasonable effort to return the child to the parent." *A.D. v. Texas Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 714 (Tex. App.—Austin 2023, no pet.) (quoting *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.)).

As discussed above, the Department developed a service plan for Mother, and the trial court ordered that Mother complete services as part of the reunification process. The testimony at trial demonstrated that the Department's caseworker attempted to engage with Mother regularly throughout the case. Specifically, the Department requested that Mother take drug tests, worked with Mother to arrange visits with the children, assisted Mother with finding a sober-living facility with a scholarship, arranged for Mother's psychological evaluation, and facilitated Mother's therapy sessions. Further, after removal, the children were placed with family members throughout this case. *See id.* (citing *In re L.C.M.*, 645 S.W.3d 914, 922 (Tex. App.—El Paso 2022, no pet.) ("[T]he Department's efforts to place the child with relatives constitutes legally and factually sufficient evidence that reunification was attempted.")). This constitutes sufficient evidence to support the trial court's finding that the Department made reasonable efforts to return the children to Mother. *See, e.g., id.* (determining Department made reasonable efforts to return child to parent by developing service plan, attempting to communicate with parent, and attempting family placement); *C.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00852-CV, 2019 WL 3367524, at *7 (Tex. App.—Austin July 26, 2019, no pet.) (mem. op.) (concluding Department made reasonable efforts to return child to parent by developing service plan, attempting to communicate with parent, assisting parent with scheduling visits, and determining whether parent secured drug-free housing).

We overrule Mother's first issue as it pertains to subsection 161.001(f).

### b. *Subsection 161.001(g)*

Mother also contends that the order of termination did not meet the requirements of subsection (g) by including in a separate section written findings describing with specificity the

reasonable efforts the Department made to return the children to her. After the final order of termination, the trial court signed supplemental findings.[2] In a separate section of that order, the trial court found that the Department made reasonable efforts to return the children to Mother and Father, but despite those efforts, a continuing danger in the home prevented the children's return, including specifically as to Mother:

> 8.1. The Department created a family plan of service for the parents that was tailored to address specific identified issues. The plan was signed by the mother and a copy given to her.
>
> 8.2. The Department made referrals for services and when necessary, paid for services for the parents to address the reasons the children came into care.
>
> 8.3. The Department identified and conducted a home study on and eventually placed the children with a relative placement.
>
> 8.4. The Department provided a local courtesy worker for the mother when she moved from Williamson County who attempted to communicate with and visit the mother at her home.
>
> 8.5. The Department requested frequent drug tests from the mother so that she could demonstrate her sobriety[.]
>
> 8.6. The Department obtained a scholarship for the mother for 2-weeks in a sober living facility and planned to transport the mother to the facility, but the mother failed to appear.
>
> 8.7. The Department maintained communication with the mother via text and emails.
>
> 8.8. The Department paid for a psychological evaluation for the mother.
>
> 8.9. The Department paid for therapy for the mother.

---

[2] We abated the case so that the trial court could make further findings. *See* Tex. R. App. P. 44.4 (prohibiting court of appeals from affirming or reversing judgment if "trial court's erroneous action or failure or refusal to act prevents the proper presentation of a case" on appeal and "the trial court can correct its action or failure to act"); *see also Ad Villarai, LLC v. Chan Il Pak*, 519 S.W.3d 132, 136 (Tex. 2017) ("When the trial court's failure [to file findings] is harmful, the preferred remedy is for the appellate court to direct the trial court to file the missing findings.").

8.10. The Department conducted family meetings and permanency conferences[.]

8.11. The Department provided an opportunity for the mother to visit with her children and moved the location of the visits to be more convenient for the mother and less convenient for the children and placement.

8.12. The Department worked with the mother towards reunification, but the mother failed to complete all services including regular drug testing and continued to make questionable decisions surrounding maintaining sobriety, her housing and relationships.

8.13. The Department visited the last known residence of Mother in an ongoing effort to evaluate the appropriateness of her housing.

Subsection 161.001(g) requires the trial court to include in a separate section of the termination order written findings describing with specificity the reasonable efforts the Department made to return the children to their home. *See* Tex. Fam. Code § 161.001(g). Mother raised her challenge regarding insufficiently specific findings before the trial court entered these additional findings. We cannot conclude after the trial court's supplemental findings that the amended order of termination fails to meet what subsection (g) requires. These findings, which are set forth in a separate section of the order, reflect evidence presented at trial regarding the efforts the Department made to return the children to their home and are sufficiently specific to comply with what the plain language of the statute requires. *See In re M.B.*, 2025 WL 3275376, at *8–9 (resolving subsection (g) challenge in Department's favor because findings in order reflected evidence adduced at trial and were sufficiently specific); *In re Y.K.*, 722 S.W.3d 273, 281–82 (Tex. App.—Fort Worth 2025, no pet.) (same).

We overrule Mother's first issue as it pertains to subsection 161.001(g).

**Best interest**

In her second issue, Mother contends that the Department did not establish that termination of her parental rights is in the children's best interests. There is "a strong but rebuttable presumption that the best interest of the child is served by keeping him or her with their natural parents." *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 525 (Tex. App.—Austin 2019, no pet.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). When reviewing the trial court's best-interest findings, courts consider factors including (1) the child's wishes, (2) the child's emotional and physical needs now and in the future, (3) emotional or physical danger to the child now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct that may indicate that the existing parent-child relationship is improper, and (9) any excuses for the parent's conduct. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). This list is not exhaustive, nor is one factor controlling. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Further, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See id.* Mother has not challenged the predicate-ground findings as to subsections (D), (E), and (O) on appeal. *See A.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-24-00599-CV, 2025 WL 554035, at *9 (Tex. App.—Austin Feb. 20, 2025, no pet.) (mem. op.) ("[B]ecause Mother has not challenged the

predicate endangerment, . . . findings against her . . . those findings are binding in this appeal and may support the best-interest finding.").

Mother points to the strong bond and love between her and her children, specifically noting their therapist's testimony about the trauma that can affect children when their parents' parental rights are terminated. She cites the children's current progress in their placement while still having regular visitation with her as indicative that their current and future needs can be met without terminating her parental rights. Mother also emphasizes that she wants the children to remain in their current placement and does not want the children placed with her, so the third best-interest consideration should be limited to emotional danger. And she urges that she has taken accountability for her addiction by dedicating herself to rehab and sobriety, plus attending individual therapy, securing a job and housing, and attending regular visitation with the children. She maintains that she is dedicated to overcoming her past trauma, homelessness, drug addiction, and abusive relationships.

However, in addition to the evidence at trial that Mother raises in favor of her argument on appeal, evidence also indicated that termination of her parental rights is in the children's best interests. For example, Mother testified to her criminal history, including a ten-year prison sentence, and her extensive history of drug use, including during her pregnancies. Though Mother maintained she had been sober since February 2025, the evidence established that Mother had previously been to rehab programs and then relapsed in the past, and a drug-related arrest prompted the referral for this case. Devin's testimony at trial also indicated that Mother would leave the children at his house while she was using drugs. *See D.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00557-CV, 2021 WL 1418986, at \*12 (Tex. App.—Austin Apr. 14, 2021, no pet.) (mem. op.) ("The trial court could also consider the emotional danger to

23

[child] in continuing a relationship with a mother who would come in and out of her life because of drug use or incarceration, disrupting any permanency or stability for [child]." (quoting *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *8 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.))); *see also In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." (citation omitted)).

Evidence also established that many of Mother's past romantic partners had been abusive towards her, which Mother acknowledged had affected Riley, and that Mother had been homeless with the children, during which she left the children alone in a car in winter, where Riley had to care for Ricky. Though Mother testified that she was living in a new home now, she had not provided that information to the Department before trial, and the Department's witness who investigated the previous address that Mother provided to the Department testified to its uninhabitable condition. *Cf. In re N.L.D.*, 412 S.W.3d 810, 822–24 (Tex. App.—Texarkana 2013, no pet.) (holding evidence that mother improved her life by maintaining employment, acquiring home environment that could accommodate children, and having romantic partner that "is a positive influence on her life" weighed against finding that termination was in child's best interest).

"A factfinder may infer that past conduct endangering a child's well-being may recur in the future if the child is returned to the parent." *M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *4 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.). Here, the trial court could have concluded that Mother's drug use, criminal history, housing instability, and selection of violent romantic partners "may recur in the future" if the children were returned to her and would expose the children to further emotional and physical danger. *See id.* The trial court could have similarly concluded that this conduct reflected poorly

24

on Mother's parenting abilities and suggested that the existing parent-child relationship was improper. *See id.*

On the other hand, testimony established that the children are thriving in their placement, where they are bonded to their aunt and uncle who want to adopt them, have consistency, and are safe. "The need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs." *Id.* at *3 (citing *Robert T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00061-CV, 2013 WL 812116, at *12 (Tex. App.—Austin Mar. 1, 2013, no pet.) (mem. op.)). While a factfinder cannot terminate a parent's rights "merely because the child might be better off living elsewhere, 'a factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered.'" *Id.* (quoting *Robert T.*, 2013 WL 812116, at *12). Here, the factfinder could have reasonably determined that, particularly when compared to the children's current placement where they have stability with a foster family who wants to adopt them, Mother's inability to secure stable housing and employment or otherwise demonstrate her ability to meet the children's basic needs over the course of this case weighed in favor of a finding that termination is in the children's best interests. *See In re S.B.*, 597 S.W.3d 571, 587–88 (Tex. App.—Amarillo 2020, pet. denied) ("The factfinder may compare the parent's and the Department's plans for the children and determine whether the plans and expectations of each party are realistic or weak and ill-defined.").

Given the record in this case, we conclude that there is sufficient evidence from which the trial court could have formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interests. This is particularly so because Mother does not challenge the endangerment findings. *See In re C.H.*, 89 S.W.3d at 27 ("The absence of evidence

25

about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child."). We overrule Mother's second issue on appeal.

## FATHER'S APPEAL

Father raises six issues on appeal, arguing that the trial court erred (1) by "sua sponte extending the dismissal date of the suit" without notice "that an extension was being considered"; (2) because the Department neither pleaded nor proved the grounds for termination under section 161.004; (3) by terminating on subsection (P) and (4) subsection (D) and (E) grounds "where all the facts allegedly supporting termination occurred before the prior order denying termination"; (5) because the evidence showed that it was in Riley's best interest not to terminate his parental rights; and (6) because there was no evidence that the Department made reasonable efforts to prevent the termination of his rights.

### Dismissal date

First, Father argues that the trial court erred by sua sponte entering an order, without notice or a hearing, that extended the automatic dismissal date under subsection 263.401(b). *See* Tex. Fam. Code § 263.401(b). He contends that because the trial court abused its discretion by entering this order, trial had to begin before the statutory dismissal date, and because trial began on the dismissal date, the court lost jurisdiction and had no discretion to do anything but dismiss the case.

Subsection 263.401(a) provides that unless the trial court begins the trial on the merits or grants an extension by the first Monday after a year from the date the court rendered its

26

order appointing the Department as temporary managing conservator, the trial court's jurisdiction over the case "is terminated and the suit is automatically dismissed without a court order." *Id.* § 263.401(a). As applicable here, the court cannot retain the suit past the one-year deadline unless it "finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b). There is no requirement for the trial court to hold a hearing before extending the dismissal date. *In re G.X.H.*, 627 S.W.3d 288, 300 (Tex. 2021). "Appellate courts generally try to uphold trial court grants of subsection (b) extensions." *S.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00189-CV, 2022 WL 16702522, at *3 (Tex. App.—Austin Nov. 4, 2022, pet. denied) (mem. op.) (collecting cases).

Here, on September 2, 2025, the trial court entered an order that made the requisite findings under subsection 263.401(b), stating the original September 8, 2025 dismissal date and setting a new dismissal date for February 5, 2026. The order also noted that the case was set for a jury trial to begin on September 8, 2025. To the extent that Father's complaint relates to inadequate notice of a hearing preceding this order, he was required to raise this complaint in the trial court. *See In re G.X.H.*, 627 S.W.3d at 300. Because he failed to do so, this complaint is waived. *Id.* (citing Tex. R. App. P. 33.1). Further, Father has not cited, and we have not found, authority for his argument that the section 263.401 extension must come on the motion of a party. The plain language of the statute does not require that the extension must be requested by a party. *See* Tex. Fam. Code § 263.401(b); *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 571 (Tex. 2014) ("We must rely on the words of the statute, rather than rewrite those words to achieve an unstated purpose."). And this Court has previously upheld challenges to extension orders entered sua

27

sponte. *See S.W.*, 2022 WL 16702522, at *3 (noting that "the trial court properly extended the dismissal deadline when it granted the extension in the April 2021 hearing, sua sponte with the subsection (b) findings").

We overrule Father's first issue on appeal.

**Section 161.004 and section 161.001 predicate grounds**

In his second issue on appeal, Father argues that because his parental rights were not terminated under section 161.004, termination must be based on circumstances after October 13, 2022—the final order date in the Department's prior case that concluded without terminating his parental rights. When, as here, the Department seeks termination after a trial court's prior denial of termination, the court may terminate parental rights one of two ways: (1) under section 161.001, which requires clear and convincing evidence of acts or omissions having occurred since the denial, or (2) under section 161.004, which requires clear and convincing evidence of an act or omission under section 161.001 that occurred before the denial and evidence of a material and substantial change since the denial. *See In re A.L.H.*, 515 S.W.3d 60, 89 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). The Department concedes that the final order does not terminate Father's rights under section 161.004 (the second option), and thus termination must be based on section 161.001 (the first option). Father's second issue is sustained.

Accordingly, we address Father's third and fourth issues, which challenge the predicate-ground findings, with that standard in mind. Father challenges the legal and factual sufficiency of the evidence supporting the trial court's findings under subsections (P),[3] (D), and

---

[3] The predicate ground now covered by subsection 161.001(b)(1)(P) was previously encompassed by subsection 161.001(b)(1)(Q). *See* Act of May 14, 2025, 2025, 89th Leg., R.S., ch. 211, § 2, 2025 Tex. Gen. Laws ___, ___ (codified at Tex. Fam. Code § 161.001; effective

(E).  Given the history of the Department's prior case, we limit our review to acts or omissions having occurred since the denial on October 13, 2022.

Subsections (D) and (E) both require proof of endangerment.  *In re S.B.*, 597 S.W.3d at 583.  A parent's endangering conduct under subsections (D) and (E) "need not 'be directed at the child'" nor is it required "'that the child actually suffers injury.'"  *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (quoting *Texas Dep't of Hum. Servs v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).  "Instead, endangerment encompasses a larger array of conduct that exposes a child to loss or injury or jeopardizes the child."  *Id.* (cleaned up).  "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being—the focus on grounds (D) and (E)."  *Id.*  These risks "can be developed by circumstances arising from and surrounding a parent's behavior"; however, they "must be more than 'a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'"  *Id.* (quoting *Boyd*, 727 S.W.2d at 533).

Subsection (D) focuses on "the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E)."  *In re S.B.*, 597 S.W.3d at 583 (citing *Doyle v. Texas Dep't of Protective & Regul. Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied)).  "The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent."  *Id.*  Subsection (E) focuses on the parent's conduct evidenced by his actions or failure to act.  *Id.* (citing *In re*

---

Sept. 1, 2025).  This ground requires that the Department prove the parent "knowingly engaged in criminal conduct that has resulted in the parent's (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition."  Tex. Fam. Code § 161.001(b)(1)(P).  The change from (Q) to (P) was nonsubstantive.

*M.J.M.L.*, 31 S.W.3d 347, 350–51 (Tex. App.—San Antonio 2000, pet. denied)). Though the conduct does not need to be directed at the child, termination under subsection (E) requires more than a single act or omission. *Id.* at 583–84. Because the evidence for subsections (D) and (E) is related, we consider the sufficiency of the evidence for both subsections together. *See In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one statutory ground is necessary to support termination of parental rights when there is also best-interest finding but requiring appellate court to detail analysis in appeal challenging termination under (D) and (E) grounds because of "due process concerns, coupled with the requirement for a meaningful appeal"); *see also In re R.R.A.*, 687 S.W.3d at 279 (reviewing termination under (D) and (E) grounds "because a finding of termination under those grounds may justify termination of parental rights to other children under subsection (M)").

Father maintains that for subsections (D) and (E), the Department relied on the evidence that he was in prison but points out that he has been in prison since before the October 2022 order that did not terminate his rights. Specifically, Father pled guilty to violations of his federal parole terms (for assaulting his wife) in August 2020, then was sentenced to twenty-seven months in federal prison. Father was serving this prison sentence when the Department's prior case concluded. However, in December 2022, after pleading not guilty, Father was convicted of conspiracy to participate in a racketeering enterprise and sentenced to life in prison. *See* 18 U.S.C. § 1962(d). And in January 2023, after pleading not guilty, Father was convicted of attempted murder in aid of racketeering and sentenced to ten years in prison. *See id.* § 1959(a)(5).

"[M]ere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *In re N.L.S.*, 715 S.W.3d 760,

765 (Tex. 2025) (per curiam) (quoting *Boyd*, 727 S.W.2d at 533). However, "[a] parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *Id.* (quoting *In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021)). Even limiting the evidence to that since October 2022, Father's "escalating convictions" support the endangerment finding under subsection (E) in the termination order. *See id.* During the Department's prior case seeking termination, Father was incarcerated for violations of his parole based on family violence, but after the final order in that case, he was convicted of attempted murder in aid of racketeering. And just as Father's criminal convictions became increasingly serious, so did his sentences. Father received a twenty-seven-month sentence for his parole violations.[4] The evidence before the trial court established that after the Department's prior case, Father was sentenced to life in federal prison, without the possibility of parole. *See In re J.F.-G.*, 627 S.W.3d at 314 ("Lengthy incarceration presents a risk of endangerment to the child's well-being[.]"). Father's escalating criminal conduct, even since the Department's prior case, has prevented him from seeing Riley, which endangers her physical and emotional well-being. *See In re N.L.S.*, 715 S.W.3d at 765 (citing *Walker v. Texas Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Conduct that routinely subjects a child to the probability that the child will be left alone because a parent is jailed endangers both the physical and emotional well-being of the child.")).

---

[4] Father also received a two-year state-prison sentence for the family violence that provided the basis for his federal parole violation, but he did not serve this sentence based on his federal sentence.

Further, to the extent that we may consider Father's pre-October 2022 acts to determine whether the Department presented sufficient evidence to establish a course of conduct under subsection (E), the evidence at trial reflected Father's extensive criminal history dating back to 1999 and which included a prior fifteen-year sentence. A parent's criminal history may be considered as an endangering course-of-conduct factor under subsection (E), as "routinely subjecting a child to the probability that the child will be left alone because his parent is in jail endangers the child's physical and emotional well-being." *F.C. v. Texas Dep't of Family & Protective Servs.*, No. 03-19-00625-CV, 2020 WL 101998, at *10 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.) (citing *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.)). Given the record, the factfinder could have reasonably concluded that Father's history of criminal activity supported the conclusion that he engaged in an endangering course of conduct under subsection (E). *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied).

Additionally, as to subsection (D), Father testified that he is aware of Mother's substance abuse issues and had previously asked her to go to rehab but lamented that "there's nothing I can do from in prison" to protect Riley from Mother's "bad behavior." "The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry." *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022). A parent does not need to know for certain that the child is in an endangering environment; awareness of "the potential for danger to the child in such environment" is sufficient. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.). Further, "conduct that subjects a child to the probability of abandonment 'because a parent is jailed endangers both the physical and emotional well-being of the child.'" *In re L.D.C.*, 622 S.W.3d 63, 71 (Tex. App.—El Paso 2020, no pet.) (quoting *Walker*,

32

312 S.W.3d at 617)). Here, Father knew about Mother's substance abuse and encouraged her to attend rehab while he was in prison. *See id.* Father's lack of actual knowledge that he knowingly placed Riley in an environment that endangered her—for example, when Mother and the children lived in a car in winter—resulted from his criminal conduct that led to his incarceration. *See In re J.F.-G.*, 627 S.W.3d at 315. Based on the evidence in the record, the trial court could have formed a reasonable belief that Father knowingly placed Child in conditions or surroundings that endangered Riley's physical or emotional wellbeing by leaving Riley in Mother's care. In sum, legally and factually sufficient evidence supports the trial court's termination of Father's parental rights under subsections (D) and (E). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E).

Finally, though we may uphold the termination on just one predicate ground, we note that the Department presented sufficient evidence to establish the grounds for subsection (P). *See id.* § 161.001(b)(1)(P). Under subsection (P), a court may terminate parental rights based on clear and convincing evidence that the parent "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." *Id.* Once the party seeking termination of parental rights produces evidence of knowing criminal conduct by the parent resulting in two or more years of confinement, the burden shifts to the parent to produce some evidence as to how he would provide or arrange to provide care for the child during his incarceration. *Brickley v. Joseph-Stephen*, No. 03-22-00574-CV, 2023 WL 2316346, at *2 (Tex. App.—Austin Mar. 2, 2023, pet. denied) (mem. op.). If the parent does so, the burden shifts back to the petitioner to establish that the proposed arrangement would fail to satisfy the parent's duty to the child. *Id.*

33

Here, the Department met its initial burden by admitting into evidence Father's December 2022 conviction of conspiracy to participate in a racketeering enterprise and sentence of life in prison, as well as his January 2023 conviction of attempted murder in aid of racketeering and sentence of ten years in prison. Father did not attempt to produce evidence as to how he would provide or arrange to provide care for Riley during his incarceration other than Riley remaining with Mother, which cannot be considered as evidence in Father's favor about his ability to provide care. *See id.* at *3 ("The fact that a surrogate cares for the child in the parent's absence is not evidence that the parent can provide the necessary care unless the caregiver is supplying the care *on behalf of*—not just in place of—the incarcerated parent."). Thus, sufficient evidence supported the trial court's termination of Father's parental rights under subsection (P).

Father's third and fourth issues challenging the statutory predicate findings for termination are overruled.

**Best interest**

Father also contends that the Department failed to establish the best-interest finding required for termination. *See* Tex. Fam. Code § 161.001(b)(2). He maintains that Riley knows who he is and wants to have a relationship with him, that he wants to be able to write letters to Riley, and that even if his rights are not terminated, "the status quo" for Riley will continue. In considering Father's argument, we are guided by the same *Holley* factors outlined above.

On this record, we conclude that the evidence is sufficient to support the trial court's determination that termination of Father's parental rights is in Riley's best interest. The evidence presented to satisfy the predicate-ground findings is similarly probative that termination of Father's parental rights is in Riley's best interest. *See id.* Father is incarcerated—he has been for

34

all of Riley's life and will be for the rest of his life—for convictions of crimes involving his role in a white-supremacy gang, including attempted murder while incarcerated. *See E.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00427-CV, 2018 WL 6056959, at *3 (Tex. App.—Austin Nov. 20, 2018, pet. denied) (mem. op.) ("A parent's current and future incarceration is relevant to his ability to meet the child's present and future physical and emotional needs, and the parent's incarceration at the time of trial makes his future uncertain." (internal quotation omitted)); *see also In re J.O.A.*, 283 S.W.3d at 345 n.4 ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." (citation omitted)). And while Father emphasizes his desire to have a relationship with Riley, he has been permitted only limited contact with her based on his incarceration. *See D.M.*, 2021 WL 1418986, at *12 ("Father has little relationship with the child, in large part due to his own conduct, which resulted in his imprisonment for two years of the child's short life."). Further, testimony showed that Devin and Alison agreed to permit Father to continue writing Riley letters through her therapist.

The evidence showed that Father attempted to comply with his service plan but was unable to do so given the limitations of the facility where he is incarcerated. Even crediting those efforts, however, the trial court could have reasonably concluded that termination of Father's rights is in Riley's best interest, particularly given that "the paramount consideration in a best-interest determination" is the "child's need for permanence through the establishment of a stable, permanent home." *E.N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at *8 (Tex. App.—Austin June 17, 2021, no pet.) (mem. op.) (quoting *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)).

On the other hand, the trial court heard evidence about how Riley is thriving in her current placement that wants to adopt her. Viewing that evidence, described in detail above, as well as the evidence in Father's favor, in the light most favorable to the best-interest finding, we conclude that there is sufficient evidence from which a reasonable factfinder could form a firm belief or conviction that termination of Father's parental rights is in Riley's best interest.

We overrule Father's fifth issue challenging the trial court's best-interest finding.

**Reasonable efforts to return**

Finally, Father argues that the Department failed to establish that it made reasonable efforts to return Riley and avoid terminating his rights. *See* Tex. Fam. Code § 161.001(f), (g). He contends that the Department's caseworker's testimony that she "did everything [she] could have possibly done based on [Father's] situation" was conclusory, and the Department "never asked him to do anything or sent him anything to do."

The testimony at trial undermines Father's position on appeal. For example, Ohanuzue testified that the Department created a service plan for Father, sent it to him in prison, and received a formal return receipt in the mail. She also said that Father "confirmed it in one of the letters he wrote me" and did not raise any questions about or objections to the service plan. Though Ohanuzue acknowledged that she had not been able to reach Father directly, she said she has been able to communicate with him through the mail and on two occasions through his case manager. Ohanuzue likewise acknowledged that Father's ability to complete the service plan was limited by his circumstances at the prison but noted that he had provided her with one certificate from a completed class since this case began.

As noted above, "[g]enerally, implementation of a family service plan by [the Department] is considered a reasonable effort to return the child to the parent." *A.D.*, 673 S.W.3d at 714 (quoting *In re A.L.H.*, 468 S.W.3d at 744). And when a parent is incarcerated, the Department's "reasonable reunification efforts" may include efforts to place the child with relatives. *In re M.N.M.*, 708 S.W.3d at 329–30. Here, the Department established a service plan for Father, communicated with him and his case manager at the prison, and placed Riley with family members (albeit on Mother's side) after Father did not propose alternative placement options on his family's side. We consider the reasonableness of the Department's efforts against the backdrop of Father's circumstances, which resulted from his own conduct. *See id.* at 332 ("The reasonableness of the Department's reunification efforts must also be considered against the backdrop of Appellants' recent history and engagement, or lack thereof, with the Department and its reunification efforts."). On this record, there is sufficient evidence to support the trial court's finding that the Department made reasonable efforts to return Riley to Father before seeking termination of his parental rights. *See, e.g.*, *id.* at 329–32 (concluding Department made reasonable efforts "under the circumstances" to return child to incarcerated parent by attempting to find "safe, stable adult relative" to care for child until parent's release "to no avail" and when Department failed to implement service plan); *A.D.*, 673 S.W.3d at 714 (concluding Department made reasonable efforts to return child to parent by developing service plan, attempting to communicate with parent, and attempting family placement).

We overrule Father's sixth issue on appeal.

## CONCLUSION

We affirm the order of termination.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Theofanis and Crump

Affirmed

Filed:   February 20, 2026